# IN THE COURT OF APPEALS OF IOWA

No. 16-1615
Filed December 6, 2017

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**CHRISTOPHER L. KING,**
　　　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Des Moines County, John M. Wright (motion) and John G. Linn (trial), Judges.

A defendant appeals his convictions for two counts of sexual abuse, assault with intent to commit sexual abuse, and penetration of genitalia with an object. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Considered by Danilson, C.J., and Tabor and McDonald, JJ.

**MCDONALD, Judge.**

Christopher King appeals his convictions for two counts of sex abuse in the third degree, assault with intent to commit sexual abuse, and penetration of genitalia with an object in violation of Iowa Code sections 709.4, 709.11, and 708.2(5) (2015), respectively. He challenges the district court's denial of his motion to adjudicate law points, the effectiveness of his trial counsel, and the sufficiency of the evidence for two of his charges.

I.

The case was tried to a jury, which found King guilty of the above-stated offenses but found him not guilty of two other counts, dissemination of obscene material and indecent exposure. The offense conduct at issue took place between June 2013 and February 2015. Each of the offenses involved a different victim. The four victims, K.R., R.F., A.O., and A.B., were teenage girls seeking senior portraits from Daisy Frames, a business owned by King and his wife, Amber King. At the time of the offenses, King was thirty-nine or forty years old.

A.

K.R. was a seventeen-year-old high school student when she arranged for Daisy Frames to take her senior pictures in September 2014. After her pictures were taken, King offered K.R. a job in which he would take ten dollars off the price of the pictures for each hour K.R. worked. K.R. wanted to reduce the cost of the pictures to ease the financial strain on her family so she accepted the offer. King and K.R. communicated with each other via Facebook messaging. At some point, King's messages became more personal and sexual in nature.

On December 24, 2014, King picked K.R. up for work. Instead of going to work, King drove K.R. outside of town. He provided K.R. with a drink containing alcohol. K.R. testified she went with him because she really wanted to help her grandmother with the cost of her pictures. K.R. was wearing multiple layers of clothing since King had told her he wanted to play "strip Truth or Dare". K.R. drank at King's urging until King decided they should play Truth or Dare. King dared K.R. to let him put his hand on her thigh for the rest of the drive. She testified she complied because she feared King would have forced her to remove clothing if she did not. King then moved his hand towards her crotch. K.R. testified she tried to push his hand away, said "no," and closed her legs tightly. King told her "just let it happen, it's okay, you won't get hurt." King then rubbed his hand over her clothing covering her vaginal area as she told him it made her uncomfortable. K.R. testified she loosened her legs, as she feared King would hurt her if she did not. King told her, "[y]ou can't tell me this doesn't feel good, it has to feel good," to which K.R. responded, "I don't feel anything." K.R. told King she needed to use the bathroom, and the two stopped at a gas station before he took her home. K.R. testified she felt lightheaded from the alcohol and slept after returning home.

The total encounter lasted between one-and-one-half and two hours on the morning of December 24. K.R. declined future offers of work from King. However, she did state at trial that she saw King on New Year's 2014, where she voluntarily participated in drinking games with King and a friend. Other trial testimony by K.R. included statements that she felt what happened between her and King was "blown out [of] proportion" and that she was "still capable of making her own decisions"

when King's conduct took place. She testified she did not disclose this event until her younger sister considered working for King a few months later.

King denied providing any alcohol to K.R. King also denied any sexual contact with K.R. Amber, King's wife, testified that King had only been gone a short time and he did not appear drunk when he returned.

B.

A.B. was an eighteen-year-old high school student when she and best friend K.R. chose Daisy Frames for their senior pictures in fall 2014. A.B. too accepted a job with Daisy Frames to pay off her photos. King sent A.B. Facebook messages asking about sex and other personal topics. When A.B. first came to work, King drove her around and provided alcohol, and they discussed personal topics. A second time, they played "Never Have I Ever." A.B. testified she was uncomfortable but wanted to help her mom by earning discounts for her senior pictures.

During another trip with King, possibly the third, King provided A.B. with more alcohol. He stopped at an adult shop and bought A.B. a dildo, vibrator, and batteries. A.B. testified she refused to take the dildo and King "threw it out the window along a back road." A.B. also tried to refuse the vibrator but King persisted until she took it. A.B. testified King parked the car and pulled out his penis, asking for a "blow job" or sex. She refused, and King was upset.

A final "work" trip occurred in the winter of 2014. A.B. stated she went along and brought the vibrator, at King's request, because she was afraid King might do something else that was worse. She testified she was too embarrassed to tell her mom despite being scared. King parked behind an abandoned house, took the

vibrator, and pestered A.B. to take off her pants. At trial, A.B. could not remember if King pulled down her pants or if she pulled down her pants. She testified, however, her pants were pulled down. She testified King turned on the vibrator and inserted it into her vagina for fifteen minutes. A.B. said she remembered the time because she stared at the digital clock in the car. She testified she felt she could not get away and did not even know where she was. A.B. told K.R. about the assault. The two reported the incidents in February 2015.

King testified he bought A.B. the vibrator for her birthday. He claims she told him she was having a bad week and he took her out for a drive. King testified A.B. asked him to watch her use the vibrator on herself and, at some point, requested he hold it. King accepted the request and manipulated the vibrator until A.B. climaxed. He remembered A.B. had a tear in her eye, but he claimed he thought she was just having a bad week. King denied showing A.B. his penis and denied A.B. was compelled to act in the vibrator incident. He testified A.B. sent him several photos of herself on Facebook and attempted to "re-friend" him in March 2015.

## C.

R.F. was a sixteen-year-old student when she applied to be a Daisy Frame's senior model.[1] R.F.'s father was deceased, and her mother was unemployed. Finances were a concern for her family. R.F. first met King in early February 2015. After a positive initial meeting, King began sending her Facebook messages. R.F. testified they were "creepy and sexual." She complained to a friend that had

---

[1] A senior model for Daisy Frames had her pictures taken by the studio and worked for the studio to help pay for those pictures.

recommended King's studio, and King apologized while "pulling a guilt trip," telling R.F., "I can't trust you now."

When R.F. was dropped off for work on February 16, 2015, King told her he needed to photograph a conservation sign in Des Moines County and she could come with him or stay and stuff envelopes. R.F. testified that she was afraid King would be mad at her if she did not go and that he might ruin her senior pictures if she did not go. They stopped for R.F. to use the restroom, and King purchased alcohol. King then put some of the alcohol in the tea R.F. had left in the car. When R.F. returned to the car the first thing King told her was that "Iowa state law says that you can have consensual sex at sixteen." King drove around talking about R.F.'s father and telling her he would not hurt her. R.F. testified that King then suggested the drinking game "Never Have I Ever" and his questions quickly turned to sex. "He asked me if I had ever had sex with someone, if I had ever given someone oral sex or, like, a hand job, or if I ever sent nude pictures or if I've ever done drugs or if I had—if I had any desire to perform any kind of sexual act on [King]." R.F. testified she felt uncomfortable but thought he was joking. King touched her leg and upper thigh, told her about his sexual history, and tried to get her to play Truth or Dare. After returning to the studio, King showed her pornography on his computer. He also unhooked her bra. This encounter ended when R.F.'s mother came to pick her up from work. King continued to send her sexual messages and began using Snapchat "because he was afraid [R.F.] was going to tell someone or show someone the messages."

R.F. met with King again on February 20 to work. She testified she was concerned her mother would lose her deposit on her senior pictures if she said no.

The two again drove around and drank. King encouraged her to drink more, and R.F. poured her own drinks. King offered R.F. money to perform oral sex. She refused. R.F. testified she was drinking heavily and eventually King stopped in a "hunting field" where they played Truth or Dare. R.F. refused many of King's dares and had to remove four articles of clothing. R.F. also testified King told her "you're turning me on a lot, I don't know if I can control myself." When they returned to the car, King pestered R.F. to drink a specific drink. R.F. remembered blacking out. When she awoke, King was touching her vagina under her clothing. She told him to stop, and he "pulled away and licked his fingers."

King's version of events differed. With respect to the events of February 20, King testified R.F. requested he buy her food from McDonald's. When he asked about payment, she "grabbed his hand and placed it in her pants, against her bare vagina, with a smile on her face." With respect to both incidents, King denied offering R.F. alcohol, money for sex, or unhooking her bra. The child protective worker who first interviewed R.F. testified for King. She testified R.F. did not remember the assault and R.F.'s mother told her R.F. had acted normally that day, did not appear drunk, and had a McDonald's bag when she returned from work that day.

## D.

A.O. was seventeen and in high school when she contacted Daisy Frames for her senior pictures in approximately June 2013. She also began working for Daisy Frames to pay off her pictures. King took A.O. to scout locations for photo shoots and offered her alcohol, which she drank. Prior to this, she had not

consumed alcohol. A.O. testified she passed out on the floor upon returning to the studio and when she awoke, King had his mouth on her vagina. She protested, and he responded, "[H]er body was asking for it." A.O. left the studio within ten minutes.

A.O. did not report this incident and testified that she carried on a sexual relationship with King for one year to protect her younger sister. She stated, "[E]very time I stopped talking to [King], he started talking to my sister." A.O. described the relationship as "necessary." A.O. allowed King to take nude photos of her for her boyfriend. A.O. testified that she led King to believe she cared for him.

King's version of events differed. King acknowledged he had consensual sex with A.O., although he hesitated at calling it a relationship. He testified he gave A.O. money and she told him she loved him and wanted him to leave his wife. King denied the June 2013 assault allegations. Witnesses for King discussed times that King had helped A.O. by taking her to the airport and advising her on problems with her boyfriend. King also denied he ever provided alcohol for A.O.

II.

In his first claim of error, King argues the district court erred in denying his motion to adjudicate law points. Review of a trial court's ruling on a motion to adjudicate law points is for correction of legal error. *See State v. Beck*, 854 N.W.2d 56, 58 (Iowa Ct. App. 2014). "The appropriateness of the district court's action turns on the correctness of its interpretation of the relevant statutes, which are

reviewable for correction of errors at law as well." *State v. Muhlenbruch*, 728 N.W.2d 212, 214 (Iowa 2007).

In his motion for adjudication of law points, King argued he did not commit a sex act against K.R. within the meaning of Iowa Code section 702.17(3) because she testified in her deposition that she did not feel King's touch of her vaginal area because she had on multiple layers of clothes. As relevant here, the code section defines a "sex act" as "contact between the finger or hand of one person and the genitalia or anus of another person . . . ." Iowa Code § 702.17(3). In *State v. Pearson*, the court made clear that a sex act does not require skin-to-skin contact. 514 N.W.2d 452, 455 (Iowa 1994). "The sexual nature of the contact can be determined from the type of contact and the circumstances surrounding it." *Id.* "[P]rohibited contact occurs when (1) the specified body parts or substitutes touch and (2) any intervening material would not prevent the participants, viewed objectively, from perceiving that they have touched." *Id.*

It is well established that a motion to adjudicate law points is proper "only when the questions of law arise from uncontroverted facts which appear in the pleadings." *Woods v. Schmitt*, 439 N.W.2d 855, 865 (Iowa 1989). Here, King did not challenge the pleadings but instead relied on K.R.'s deposition testimony in an attempt to establish she did not feel his touch. Whether or not a sex act occurred and whether or not K.R. felt the touch were questions of fact for the jury and not proper subjects of a motion to adjudicate law points. *See State v. Baker*, 688 N.W.2d 250, 253 (Iowa 2004) ("The district court should not have resolved this factual dispute in ruling on the constitutional issue, since the constitutional challenge to the statute was raised in a motion to adjudicate law points. Motions

to adjudicate law points may not be used to resolve factual disputes, only legal issues."); *Woods v. Schmitt*, 439 N.W.2d 855, 865 (Iowa 1989) (stating when the facts "were in dispute . . . [t]he motions should have been denied"); *State ex rel. Miller v. Hydro Mag, Ltd.*, 379 N.W.2d 911, 913 (Iowa 1986) (stating the motion is proper "only when the trial court is presented a legal issue that is independent of a disputed factual issue and a ruling favorable to the applying party will necessarily be dispositive of the case in whole or in part"); *State v. Wilt*, 333 N.W.2d 457, 460 (Iowa 1983) (stating a motion to adjudicate law points "lies for resolution of legal issues, and may not be used to resolve factual arguments" and is "appropriate only where material facts are undisputed").

Because the motion to adjudicate law points was not proper, the district court did not err in denying King's motion. The correctness of the district court's ruling and the impropriety of King's motion were demonstrated during trial. At trial, K.R. testified about the touch. She testified she felt King's touch despite her clothing. When King's counsel attempted to impeach K.R. with her prior deposition testimony, K.R. clarified she told King she did not feel anything. She testified she felt it, but she did not feel any pleasure from the touch. We conclude King is not entitled to any relief on his first claim of error.

III.

King's second claim of error relates to the testimony of expert witnesses. Specifically, he contends certain expert witness testimony was impermissible bolstering of witness credibility or vouching. By way of background, the State and the defense called experts. State expert Karla Miller testified regarding sexual abuse and the reactions of victims of sexual abuse. King's expert, Veronica

Lestina, testified about how trauma and alcohol consumption can create false memories. Another defense expert, Dr. Rehberg, testified that the amount of alcohol R.F. and A.O. say they consumed would have led to them becoming unconscious or dying. King argues his trial counsel provided constitutionally deficient representation in failing to object to certain vouching testimony by Miller.

Ineffective-assistance-of-counsel claims are reviewed de novo. *Everett v. State*, 789 N.W.2d 151, 155 (Iowa 2010). To succeed on an ineffective-assistance claim a defendant must show "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). "[W]e measure counsel's performance against the standard of a reasonably competent practitioner." *Id.* Poor strategy or mistakes in judgment normally do not rise to the level of ineffective assistance. *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001). Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Leckington*, 713 N.W.2d 208, 217 (Iowa 2016). "[B]oth elements do not always need to be addressed. If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma*, 626 N.W.2d at 142.

Generally, "[w]e have permitted an expert witness to testify regarding the 'typical symptoms exhibited by a person after being traumatized.'" *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) (citation omitted). "Although we are committed to the liberal view on the admission of psychological evidence, we continue to hold expert testimony is not admissible merely to bolster credibility." *Id.* (citing *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992)). In a trio of recent decisions, the Iowa

Supreme Court clarified the very thin line between admissible expert testimony regarding abuse and inadmissible testimony constituting opinion on credibility or vouching. In *Dudley*, the court found an expert's testimony that "a child's physical manifestations or symptoms are consistent with sexual abuse trauma" was impermissible indirect vouching. 856 N.W.2d at 677. *State v. Jaquez* held an expert's opinion that a child's demeanor was "completely consistent with a child who has been traumatized" was also impermissible vouching. 856 N.W.2d 663, 665 (Iowa 2014). However, the court was careful to note that "[w]e allow an expert witness to testify generally that victims of child abuse display certain demeanors." *Id.* at 666. Finally, in *State v. Brown*, a doctor's report stating a child's disclosure of sexual abuse was "significant" and that an "investigation is clearly warranted" was impermissible evidence. 856 N.W.2d 685, 689 (Iowa 2014). Other comments in the report as to the child's consistent statements and clear and detailed history were not impermissible vouching. *Id.*

King first takes issue with several general categories of Miller's testimony regarding general characteristics of sex abuse cases, including testimony about the following: victim dissociation from trauma, victim denial, the failure to report, victim memory loss, a perpetrator's attempts to gain information regarding victims, a perpetrator's selection of vulnerable victims, and a perpetrator's grooming of the community. As an initial matter, we question whether the claims are properly presented for appellate review. The supreme court has made clear that error must be preserved with respect to each challenged statement. *See State v. Towney*, No. 14-1673, 2016 WL 530262, at *2 (Iowa Ct. App. Feb. 10, 2016). It is thus insufficient for the defendant on appeal to merely identify general categories of

testimony to which his counsel should have objected. The testimony is not viewed as a whole to determine the cumulative effect based on the entirety of the expert's testimony. *Towney*, 2016 WL 530262, at *3 ("During oral argument, Towney's counsel explained while no single statement constituted improper vouching or improper opinion regarding guilt or innocence, the testimony as a whole effectively did so. Under *Dudley*, we do not think Towney's testimony-as-a-whole approach presents a viable claim.").

Even if the claims were properly presented for appellate review, we find nothing objectionable in the challenged testimony. "[E]xpert witnesses may express opinions on matters explaining the pertinent mental and physical symptoms of the victims of abuse." *State v. Allen*, 565 N.W.2d 333, 338 (Iowa 1997). An expert may testify generally about victim behavior, including delays in reporting events and why recollection may seem inconsistent, just not the validity of the behaviors of *this* victim. *State v. Tjernagel*, No. 15-1519, 2017 WL 108291, at *4 (Iowa Ct. App. Jan. 11, 2017) (discussing recent vouching precedent). "In deciding whether expert responses fall on the right or wrong side of the line, our courts have focused on how closely the responses were tied to the facts of the particular case." *Simpson v. State*, No. 15-1529, 2017 WL 1735615, at *5 (Iowa Ct. App. May 3, 2017). Here, the testimony was sufficiently general and not tied by the witness to the particular facts of this case. The application of the witness's testimony to the facts at hand was left to the jury. Because objections to the challenged testimony were not warranted, counsel was not ineffective in failing to make the objections. *See State v. Brothern*, 832 N.W.2d 187, 192 (Iowa 2013) ("We will not find counsel incompetent for failing to pursue a meritless issue."). We

thus reject King's claims of ineffective assistance of counsel with respect to this testimony.

King also challenges another category of Miller's testimony. On cross-examination, defense counsel queried the expert on issues related to false reporting. Defense counsel asked, "[D]o you believe false reporting is not possible then?" Miller testified that she did not believe, by and large, many victims falsely report and that those who do often display factors that lead to discovery. She also stated, "[I]n the FBI uniform crime report . . . [sexual offense false reports occur] no more than any other crime and is sometimes less" and sexual crimes are "vastly underreported." King argues since most of his claims center on false memories and false reporting by the victims, such testimony vouched for the credibility of his accusers. He argues his trial counsel was ineffective for inadvertently eliciting this testimony.

Trial counsel should be allowed the opportunity to justify the trial strategy and the reason or reasons for asking these questions. The current record is inadequate to resolve this claim on direct appeal. *See State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006) ("Only in rare cases will the trial record alone be sufficient to resolve the claim on direct appeal."); *State v. Atley*, 564 N.W.2d 817, 833 (Iowa 1997) ("[C]laims of ineffective assistance of counsel raised on direct appeal are ordinarily reserved for postconviction proceedings to allow full development of the facts surrounding counsel's conduct."). We thus preserve this single claim of ineffective assistance of counsel for postconviction-relief proceedings.

Finally, King claims all the alleged vouching testimony was improperly emphasized in closing. To the extent we have found his claims to be meritless,

the logic extends to use in closing. We preserve the claim to the extent it relates to the specific false reporting testimony preserved above.

## IV.

In his third and fourth claims of error, King contends there is insufficient evidence supporting his convictions for the sexual abuse of K.R. and penetration of genitalia with an object regarding A.B. Our review is for the correction of legal error. *See State v. Brubaker*, 805 N.W.2d 164, 171 (Iowa 2011). In conducting this review, we "consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)). "[W]e will uphold a verdict if substantial record evidence supports it." *Id.* (alteration in original). "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.* "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *Id.* (alteration in original).

## A.

We first address King's claim with respect to the sufficiency of the evidence supporting his conviction for sex abuse. The State was required to prove the following: (1) King performed a sex act with K.R.; (2) King performed the sex act by force or against the will of K.R.; (3) King and K.R. were not then living together as husband and wife. *See* Iowa Code § 709.4. King challenges only the second element.

When the evidence is viewed in the light most favorable to the jury's verdict, the jury could have inferred King's conduct was against K.R.'s will. She testified:

> I tried to push his hand away, and I said, no, and he said, "just let it happen; it's okay, you won't get hurt," and I tried closing my legs tightly so that he couldn't get to the area, but he continued to start rubbing my crouch [sic] area, and I kept telling him, I don't feel comfortable doing this, and he said, "you can't tell me this doesn't feel good; it has to feel good" . . . . I'm not really big on that stuff, and he was a lot older than me, so it made it a lot more uncomfortable, and I felt violated, because I told him no, and I felt disrespected.

While King is correct that K.R. conceded King did not use physical force while committing the sex act, the argument is immaterial. The jury was instructed, "[T]he State does not have to prove that K.R. physically resisted the defendant's acts" and the "force used by the Defendant does not have to be physical." The jury instruction was a correct statement of Iowa law. *See* Iowa Code § 709.5 ("[I]t shall not be necessary to establish physical resistance by a person in order to establish that an act of sexual abuse was committed by force or against the will of the person."). Here, K.R. testified she allowed the touching to continue because she was afraid of physical harm if she did not comply. K.R.'s sense of fear was credible considering her prior testimony regarding King's conduct when he did not get his way and the fact King had driven her out to an isolated area with which she was unfamiliar. K.R.'s fear of King was sufficient to show she did not consent to the sex act and that it was against her will. *See, e.g., State v. Bauer*, 324 N.W.2d 320, 322 (Iowa 1982) ("It is true defendant did not threaten complainant and used no force except that which is necessary for the act of sexual intercourse itself. We believe, however, that the jury could—and obviously did—believe complainant when she testified to fear which rendered her incapable of protest or resistance.

This is all our statute demands."); *State v. Ingram*, No. 15-1984, 2017 WL 514403, at *3 (Iowa Ct. App. Feb. 8, 2017) (stating the victim's subjective fear of abuser was relevant to show sex act was against her will); *State v. Espinoza*, No. 07-0605, 2007 WL 4197202, at *1 (Iowa Ct. App. Nov. 29, 2007) (stating "[s]ubjective circumstances are considered in making this determination" and the victim's testimony she was afraid of the abuse and felt she did not have any choice but to consent was sufficient evidence to establish sex acts were against the victim's will).

B.

We next address the sufficiency of the evidence in support of King's conviction for penetration of genitalia with an object. To prove the offense, the State was required to prove: (1) King assaulted A.B. by doing an act which was intended to cause pain or injury to A.B., or result in physical contact which was insulting or offensive to A.B.; (2) King had the apparent ability to do the act; and (3) when King committed the assault, he used an object to penetrate A.B.'s genitalia. *See* Iowa Code §§ 708.1(2), .2(5). We first note King failed to raise this challenge in his motion for judgment of acquittal. He has thus failed to preserve error with respect to this challenge. *See Brubaker*, 805 N.W.2d at 170 ("To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal."). However, King raises the challenge within the framework of an ineffective-assistance-of-counsel claim. *See State v. Truesdell*, 679 N.W.2d 611, 615–16 (Iowa 2004). We review the claim within that well-established framework.

King challenges the sufficiency of the evidence establishing that he intended to cause A.B. pain or injury or that he intended the act to result in physical contact which was insulting or offensive. We have little trouble concluding there is substantial evidence in support of the verdict when the evidence is viewed in the light most favorable to the State. A.B. testified she was intimidated, frightened, and manipulated when she brought the vibrator to her meeting with King. A.B. testified King gained her trust, gave her alcohol, and then drove her somewhere isolated and used the vibrator on her against her will. A.B. testified, "I still didn't want him to do that, and then he turned it on, put it on my pants forcefully. I asked him to stop. He didn't. And the next thing I knew, he was inserting it in me." She testified about how upset this incident made her and how disrespected she felt by King. Beyond A.B.'s explicit testimony regarding how the incident made her feel, the jury could have reasonably inferred that insertion of a device into the victim's vagina against her will would be insulting or offensive.

King does not really seem to deny this evidence is sufficient to support the conviction. Instead, he seems to contend his version of events is more credible. Specifically, King argues A.B. brought the vibrator to the encounter, used it on herself, and requested he help her. This would show the penetration was not insulting or offensive but instead solicited. He further contends his story is more credible because A.B. attempted to make contact with him after this incident by "re-friending" King on Facebook. We disagree King's version of events is more credible. Regardless, that is not the question presented on his sufficiency challenge. The question presented is whether the verdict is supported by substantial evidence when the evidence is viewed in the light most favorable to the

State. It is in this case. We will not disturb the jury's credibility determination. *See Thomas*, 847 N.W.2d at 442 (discussing credibility as a jury issue).

Because any challenge by counsel to the sufficiency of the evidence with respect to this conviction would have been without merit, we conclude counsel was not ineffective in failing to move for acquittal on the ground presented. *See Brothern*, 832 N.W.2d at 192.

V.

In light of the above, we preserve for postconviction-relief proceedings

King's vouching claim as to the false reporting testimony and affirm the defendant's convictions.

**AFFIRMED.**