**STATE of Iowa, Plaintiff–Appellee,**

v.

**Kristina Joy FETTERS, Defendant–Appellant.**

No. 96–0239.

Court of Appeals of Iowa.

Feb. 26, 1997.

William A. Price, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, John P. Sarcone, County Attorney, and Steve Foritano and Karen A. Romano, Assistant County Attorneys, for appellee.

Heard by HABHAB, C.J., and STREIT and VOGEL, JJ.

HABHAB, Chief Judge.

Kristina Joy Fetters appeals from the judgment and sentence entered following her conviction of first-degree murder. She challenges (1) the sufficiency of evidence to support her conviction; (2) the district court's exclusion of her proposed jury instruction to inform the jury of the consequences of a not guilty by reason of insanity or diminished capacity verdict; (3) a violation of her Sixth Amendment right to a jury comprised of a fair cross-section of the community; and (4) the district court's decision to allow color autopsy photos of the victim, Arlene Klehm.

The State filed a trial information charging defendant with first-degree murder with malice aforethought and premeditation and/or while participating in the forcible felony of robbery of Arlene Klehm. Jurisdiction had been transferred from juvenile court to district court on February 17, 1995. Defendant admitted to the murder but asserted insanity and diminished capacity defenses.

On December 18, 1995, a jury found defendant guilty of the first-degree murder of Arlene Klehm. Klehm was defendant's seventy-three-year-old great aunt. Defendant was fifteen years old at the time of the conviction. The district court denied defendant's motions for judgment of acquittal. Defendant was sentenced to life imprisonment.

Defendant appeals.

*I. Sufficiency of the Evidence.* When reviewing sufficiency of the evidence, we consider the entire record and determine whether the verdict is supported by substantial evidence. *State v. Shumpert,* 554 N.W.2d 250, 253 (Iowa 1996). " 'Substantial evidence' is 'such evidence as would convince a rational trier of fact that defendant is guilty beyond a reasonable doubt.' " *Id.* (citing *State v. Robinson,* 288 N.W.2d 337, 339 (Iowa 1980)). In making this determination, we view the evidence in the light most favorable to the verdict and accept as established all reasonable inferences that support it. *Id.; State v. Gay,* 526 N.W.2d 294, 295 (Iowa 1995); *State v. Geier,* 484 N.W.2d 167, 170 (Iowa 1992). The weight of the evidence and credibility of witnesses are to be determined by the jury and not the appellate court. *State v. Allen,* 348 N.W.2d 243, 247 (Iowa 1984).

The facts reveal that in January 1994 defendant became a resident of Orchard Place, a residential facility for the psychological and emotional treatment of children, located in Des Moines. At trial, the State presented

the testimony of three residents of Orchard Place who testified they had discussions with defendant about running away. The record reveals defendant began planning to elope from Orchard Place in mid-October. Jessica Wilhite testified that during her conversations with defendant she explained Klehm had a lot of money and she (defendant) and Tisha Versendaal planned to kill her and take her truck and money.

Tisha Versendaal was also a resident of Orchard Place. She testified she also had conversations with defendant about eloping. She explained defendant planned to kill Klehm by stabbing her and cutting her throat while she was sitting in a chair. Further, defendant had informed her Klehm had money kept in a safe. She explained that in the days just before defendant eloped, she noticed defendant appeared more and more volatile and upset.

Jeanie Fox was defendant's suite mate at Orchard Place and accompanied her at the time of the homicide. She testified she and defendant each packed a bag and left Orchard Place together. As they were leaving, defendant mentioned to her that she was going to kill her aunt. That afternoon the two stopped at three different places before proceeding to the aunt's home. One of the home's occupants testified, after being asked to describe defendant's demeanor that afternoon, "She seemed to know what she was doing. She seemed to have it all down just what she was going to say and how she was going to do it." One of the residents of another home testified that defendant joined in conversation, appeared to understand, and appropriately responded to questions. The two girls eventually made their way to the home of a friend of defendant and there obtained a small paring knife. Defendant joked about killing Klehm before leaving the apartment.

The two girls were dropped off on the east side of Des Moines near Klehm's home. Fox explained that when the two arrived at Klehm's home, a van was parked outside. The two concealed themselves outside the house near a fence and waited for the owners of the van to leave. While waiting, defendant repeated her plan to kill her aunt and explained Satan had given her the power to do so.

After the van left, the two girls went up to the house and Klehm let them in. At some point, defendant pulled Fox into a side room and again informed her that she was going to kill her aunt. Defendant then returned to the kitchen area where Klehm was sitting. Thereafter, defendant struck Klehm on the head from behind with a kettle while Klehm was seated in the kitchen. Klehm got up and asked her what happened. Defendant then struck her in the head again with a frying pan. Defendant then asked Fox for the paring knife. She got on top of Klehm and attempted to slit her throat. Defendant then got a bigger kitchen knife and proceeded to stab Klehm in the back.

During the attack, Klehm was screaming and asked Fox for help. Klehm also attempted to reach for a phone in the kitchen area. Defendant told her "no" and removed the phone from the hook.

After the attack, defendant removed her bloody clothing. She then took some necklaces and began looking for the keys to her aunt's safe and truck but was unable to locate them. Defendant and Fox then left the scene. Once outside, defendant thought she heard sirens. The two girls started running. Defendant began to cry. The two girls then started pounding on neighborhood doors until they found someone who called the police. After police arrived, defendant cried and stated repeatedly she had killed her aunt.

***a) Insanity Defense.*** Iowa Code section 701.4 (1993) provides, in part:

A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a disease or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

When a defendant raises a defense of insanity, her burden of proof is by a preponderance of the evidence. Iowa Code § 701.4.

Defendant argues she has produced sufficient evidence to establish she was either incapable of knowing the nature and quality of her actions in killing Klehm or that she could not distinguish right from wrong in relation to that act.

As it relates to defendant's insanity defense, the State presented the testimony of psychiatrist Michael Taylor. Dr. Taylor examined defendant and opined she was fully capable of understanding the nature and quality of her acts and was fully capable of distinguishing right from wrong on October 25. He explained that he found no evidence of any diagnosable psychiatric disorder and he believed she suffered from only a personality disorder. Dr. Taylor noted defendant's precise planning and deception in the execution of her plan and statements she made after the killing which reflected she understood what she had done.

In support of her defense of insanity, defendant directs us to the trial testimony of psychiatrist Gaylord Nordine. Dr. Nordine testified defendant did not know the difference between right and wrong and was incapable of understanding the nature of her acts on October 25 because she was in a psychotic state. He opined she had a physical disorder involving the brain's limbic system. He also believed Prozac prescribed to defendant and her treatment at Orchard Place may have had a "toxic" effect on her.

However, Dr. Taylor noted the various medications defendant was then receiving, including Prozac, would not have had any adverse consequences for her. It was also noted by Dr. Taylor that defendant was receiving Thorazine at the time, which has the effect of making one less inclined to be aggressive.

Dr. Nordine additionally testified as to his belief that defendant was in a sustained affectively-centered psychotic state by approximately the first few days of October 1994. He explained he believed defendant experienced an "affective storm" which totally overwhelmed all other operations of her brain, leaving her in a dangerous limbic psychotic state before murdering Klehm. He testified defendant's ability to carry out ministerial tasks just prior to the killing of her aunt did not alter his opinion that she was not sane when killing Klehm. He also explained it was not inconsistent with defendant's mental condition that she would have understood the nature and consequences of her actions one hour after the killing.

Defendant also directs us to the trial testimony of Jeanie Fox. Fox testified defendant was repeating the word "Anthony" while killing Klehm. There was also stipulated testimony at trial that shortly thereafter defendant was experiencing hallucinations. Defendant argues this evidence established she was legally insane at the time of the murder.

Dr. Taylor, however, testified he was skeptical of defendant's claims of hallucinations. Two other professionals who had contact with defendant had also indicated skepticism of defendant's reports of symptoms of mental disturbances, with one noting a concern that defendant's reports might be made "to gain some particular objective."

In explaining his opinions, Dr. Taylor noted the facts regarding defendant's planning, deception, exercise of her plan with precision, and the statements she made after which reflected she knew what had been done. Dr. Taylor further testified the most important information he received that formed the basis of his opinion was the information he received from defendant. He testified:

> In talking with her I found absolutely no evidence of any type of psychiatric disorder, and in talking with her I found absolutely no indication that she was doing anything on October 25, 1994, other than killing her aunt.

[3] *b) Insanity Defense—Jury Question.* A defendant may not be acquitted by reason of insanity unless the evidence shows defendant suffered from a disease or deranged condition of the mind which rendered defendant either: (1) "incapable of knowing the nature and quality of the act"; or (2) "incapable of distinguishing between right and wrong in relation to that act." Iowa Code § 701.4 (1993). The first prong concerns whether at the time of a crime a defendant "knew what he [or she] was doing;" the second prong concerns whether a defendant

knew the act was wrong despite awareness of what he [or she] was doing. *State v. Thomas*, 219 N.W.2d 3, 6 (Iowa 1974). The jury was instructed consistent with these principles.

█ The defense called witnesses who testified favorably on those questions. Likewise, the State called expert witnesses who gave testimony directly rebutting the defense's evidence. When conflicting psychiatric testimony is presented to the fact finder, sanity is "clearly an issue for the jury to decide." *State v. Hahn*, 259 N.W.2d 753, 758 (Iowa 1977); *see also State v. Lass*, 228 N.W.2d 758, 768 (Iowa 1975). When the psychiatric testimony is conflicting, the reviewing court will "not determine anew the weight to be given trial testimony." *State v. Wheeler*, 403 N.W.2d 58, 61 (Iowa App.1987).

█ We find there is substantial evidence in the record to uphold the conviction of first-degree murder. In addition, we find there is substantial evidence to support the jury's conclusion that defendant failed to show by a preponderance of evidence she was incapable of knowing the nature and quality of her actions or that she was incapable of distinguishing between right and wrong in relation to her actions at the time she killed Klehm.

█ We find the jury could have determined from substantial evidence within the record that defendant did possess the requisite specific intent necessary for a first-degree murder charge. Resolution of conflict in the evidence is for the jury to decide. *State v. Brown*, 466 N.W.2d 702, 704 (Iowa App.1990).

The jury is at liberty to believe or disbelieve the testimony of witnesses as it chooses ... and give such weight to the evidence as in its judgment the evidence is entitled to receive.... The very function of a jury is to sort out the evidence presented and place credibility where it belongs.

*Id.* (citing *State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984)).

We have carefully considered all of the evidentiary concerns raised by defendant and find there is substantial evidence to support defendant's conviction of first-degree murder.

***c) Malice Aforethought and Specific Intent.*** Defendant next argues the State failed to prove beyond a reasonable doubt that she possessed the requisite malice aforethought and specific intent for a conviction of first-degree murder. In support of this argument, defendant again directs us to the testimony of Dr. Nordine. She asserts, in light of this evidence, she has shown that her mental impairment precluded her from having malice aforethought and specific intent.

As we have found substantial evidence to support the jury's conviction of defendant under the previous subsection, we reject defendant's contentions in this regard and reiterate that substantial evidence in the record exists on which the jury could render a verdict against defendant for murder in the first degree.

***II. Dispositional Consequences of Verdict.*** Defendant argues the district court should have granted her request for a jury instruction informing the jury that should it return a verdict of not guilty by reason of insanity, the verdict would not result in her release, but rather further proceedings would be conducted to determine her appropriate placement.[1]

We review a trial court's determinations regarding jury instructions for errors at law. Iowa R.App. P. 4; *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996).

█ We affirm the trial court's exclusion of this instruction. The United States Supreme Court has held generally the consequences of a not guilty by reason of insanity verdict should not be issued.[2] *Shannon v.*

---

1. The following request was made of the district court by defense counsel:

    Your honor ... I would request the court give an instruction to the general effect that if the jury enters a verdict of not guilty by reason of insanity, it does not mean that the defendant goes free but rather that further proceedings

    are had in these courts to determine the appropriate placement of the defendant.

2. The court did note, however, it was not imposing an "absolute prohibition" on such instructions. The court indicated that in limited circumstances it may be appropriate to so instruct

*United States*, 512 U.S. 573, 586–88, 114 S.Ct. 2419, 2428, 129 L.Ed.2d 459, 471 (1994). Additionally, our state supreme court has expressly held the refusal of this type of instruction is not error. *See State v. Oppelt*, 329 N.W.2d 17, 21 (Iowa 1983); *State v. Hamann*, 285 N.W.2d 180, 186 (Iowa 1979).

The majority rule is that the jury should not be informed of the effect of such a verdict. Two principle reasons are given for this view. The first is that such information is irrelevant to the jury's proper function, the determination of the insanity issue. The second reason is that the information would invite a compromised verdict. . . .

[A]n instruction to the jury regarding the post-trial disposition of a defendant found not guilty by reason of insanity is irrelevant to the jury's proper function. It could only serve to confuse the jury or invite it to consider improperly defendant's post-trial disposition. A jury might improperly consider defendant's post-trial disposition even in the absence of an instruction on that subject. But this does not justify our aiding and abetting it in that role. Rather, such a possibility merely tends to illustrate the necessity of precisely informing the jury of its proper function.

*Hamann*, 285 N.W.2d at 186 (citations omitted). In light of these well-established principles, we affirm the district court's exclusion of this instruction.

***III. Jury Venire.*** At trial defendant challenged the jury venire. She requested the venire be discharged because the forty-six prospective jurors were Caucasian.[3] She asserted the venire was not a fair cross-section of the community and as such was violative of her Sixth Amendment rights. Defendant is biracial; one parent is Caucasian and the other is African–American. The court overruled defendant's motion to discharge the panel.

Defendant asserts in her brief:

There was no meaningful possibility that the lack of representation of African–Americans from the Polk County venire summons occurred by chance, and therefore was due to the systematic exclusion of the group from the jury selection process.

Defendant further argues that as a result the State bears the burden of showing a justifiable reason for the disproportionate representation and must do so by showing that obtaining a fair cross-section is incompatible with a significant State interest.

■ Because this argument raises a constitutional issue, our review is de novo. *See State v. Jones*, 490 N.W.2d 787, 789 (Iowa 1992).

■ A person accused of a crime has a right to a speedy and public trial by an impartial jury. U.S. Const. amend. VI; Iowa Const., art I, § 10. This entitles the accused to a jury panel designed to represent a fair cross-section of the community. *Holland v. Illinois*, 493 U.S. 474, 477, 110 S.Ct. 803, 805–06, 107 L.Ed.2d 905, 914 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 526–31, 95 S.Ct. 692, 696–98, 42 L.Ed.2d 690, 695–99 (1975); *State v. Huffaker*, 493 N.W.2d 832, 833 (Iowa 1992); *State v. Brewer*, 247 N.W.2d 205, 209 (Iowa 1976). However, "[a] criminal defendant's right to an impartial jury does not guarantee representation of his [or her] race on the jury panel." *State v. King*, 225 N.W.2d 337, 342 (Iowa 1975); *Thongvanh v. State*, 494 N.W.2d 679, 683 (Iowa 1993).

■ To establish a prima facie violation of the requirement that a jury be representative of the community, the applicant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2)

---

the jury; such as when a prosecutor stated in the jury's presence the defendant would "go free" if found not guilty by reason of insanity. *Shannon v. United States*, 512 U.S. 573, 586–88, 114 S.Ct. 2419, 2428, 129 L.Ed.2d 459, 471 (1994). We find the present case is not one which warrants the invocation of any such exception.

**3.** There is some indication in the record not all jurors indicated their race on the jury questionnaire. However, the questionnaires were not made part of the record by either party. Furthermore, there is some indication one juror may have been of mixed ethnic background, but there is no indication the juror's heritage was African–American.

that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to the systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–87 (1979); *Thongvanh,* 494 N.W.2d at 683; *State v. Watkins,* 463 N.W.2d 411, 414 (Iowa 1990). If a prima facie case is made, "the burden shifts to the State to demonstrate a justifiable reason for the disproportionate representation by showing that obtaining a fair cross-section is incompatible with a significant State interest." *Duren,* 439 U.S. at 368, 99 S.Ct. at 670–71, 58 L.Ed.2d at 589–90 (1979); *Jones,* 490 N.W.2d at 793.

Assuming defendant has met the first prong of the *Duren* test, we next consider the remaining two prongs set forth in *Duren. See Jones,* 490 N.W.2d at 793.

▪ Under the second prong of *Duren,* when determining whether the representation of African–Americans in the jury venire at hand was fair and reasonable in relation to the number of African–Americans in the community, we utilize an absolute disparity calculation. *See Huffaker,* 493 N.W.2d at 833. In making this calculation, we consider only the distinctive group involved. *Id.*

▪ Absolute disparity is determined by taking the percentage of the distinct group in the population and subtracting from it the percentage of that group represented in the jury panel.[4] *See United States v. Sanchez–Lopez,* 879 F.2d 541, 547 (9th Cir. 1989); *United States v. Rodriguez,* 588 F.2d 1003, 1007 (5th Cir.1979); *Jones,* 490 N.W.2d at 793. A numerical disparity alone does not violate any of defendant's rights and thus will not support a challenge to the jury selection process utilized in Polk County. *United States v. Garcia,* 991 F.2d 489, 492 (8th Cir.

1993). We need not determine the significance of disparity as defendant has failed to establish that any alleged disparity in the representation of African–Americans within Polk County venires is due to systematic exclusion in the jury selection process as required by the third prong of *Duren.*

▪ Under the third prong of the *Duren* test, defendant is required to show that African–Americans are under-represented in the jury selection process due to systematic exclusion. *Duren,* 439 U.S. at 364, 99 S.Ct. at 669, 58 L.Ed.2d at 586–87; *see Garcia,* 991 F.2d at 491. To make this showing, defendant must show the exclusion is "inherent in the particular jury-selection process utilized." *Duren,* 439 U.S. at 366, 99 S.Ct. at 669, 58 L.Ed.2d at 588. We find it significant that defendant failed to present evidence to the trial court regarding the procedures utilized in Polk County for drawing jury venires. Defendant also failed to provide any statistical evidence to substantiate her claim of the under-representation of African–Americans in Polk County jury venires, or analysis as to the probability that under-representation, if shown, did not occur in this instance by chance. Because defendant has failed to meet the third prong of the *Duren* test, we find she has not established a violation of her Sixth Amendment rights.

*IV. Admission of Autopsy Photographs.*
During the testimony of Polk County Medical Examiner Dr. Francis L. Garrity, the State introduced six color photographs of Klehm's autopsy. Garrity testified regarding five fatal stab wounds to Klehm's back and other wounds on her hands and head. The autopsy photographs were quite graphic in nature. They depict the stab wounds on Klehm's back, the wounds on her hands, and bruises and lacerations on her forehead, face, and on the back of her head. Dr. Garrity utilized the photographs when testifying about the autopsy and the cause of death.

---

4. In considering defendant's argument under the second prong of *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–87 (1979), we note African–Americans represent 4.52% of the total population of Polk County according to the 1990 census. We take judicial notice of these figures as defendant provided no

evidence of the African–American population of Polk County to the trial court. *See State v. Huffaker,* 493 N.W.2d 832, 833–34 (Iowa 1992). Thus, the absolute disparity between African–Americans in Polk County (4.52%) and African–Americans on the jury panel at trial (0%) would be 4.52%.

Defendant argues the trial court abused its discretion in admitting these photographs. She points out she has essentially admitted to the commission of the homicide and acknowledged she struck and stabbed Klehm. She contends because the jury was not asked to determine who killed Klehm or how the killing was accomplished, the prejudicial effect of the photographs outweighed any probative value they may have had.

We disagree. Autopsy photographs are admissible to illustrate medical testimony and demonstrate viciousness in connection with the State's claim of malice. *State v. Plowman,* 386 N.W.2d 546 (Iowa App.1986).

> The test for admitting photographs is twofold: "(1) the evidence must be relevant and (2) if the evidence is relevant the trial court must determine whether the probative value of the exhibits outweighs the prejudice which would be caused by their admission into evidence."

*State v. Brown,* 397 N.W.2d 689, 700 (Iowa 1986) (citing *State v. Oliver,* 341 N.W.2d 25, 33 (Iowa 1983)).

> The autopsy photographs simply embellished the graphic picture that already had been drawn, both verbally and visually, for the jury.
>
> That the autopsy photographs were themselves somewhat gruesome does not render them inadmissible. Murder is often a gruesome affair giving rise to equally gruesome evidence. That alone is not sufficient reason to exclude that evidence.

*Id.* (citations omitted).

We find the photographs were relevant as they illustrated the medical testimony and made it comprehensible for the jury. They also demonstrated the viciousness of the crime in support of the State's claim of malice. Furthermore, the probative value of the photographs was not outweighed by their prejudicial effect. We find the trial court did not abuse its discretion in admitting the color autopsy photographs.

**AFFIRMED.**