# IN THE COURT OF APPEALS OF IOWA

No. 23-0794
Filed September 4, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**GREGORY MICHAEL DAVIS,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Linn County, Sean McPartland, Judge.

A criminal defendant appeals his conviction for second-degree murder. **AFFIRMED.**

Alfredo Parrish and Margaret Stuart of Parrish Kruidenier, L.L.P., Des Moines, for appellant.

Brenna Bird, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee.

Considered by Badding, P.J., Buller, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GAMBLE, Senior Judge.**

Gregory Davis appeals his conviction for murder in the second degree.  He argues he should have been found not guilty by reason of insanity, and alternatively, insufficient evidence supports the jury finding his stabbing of Carrie Davis was the cause of her death rather than a methamphetamine overdose.[1]  Having considered both his arguments, we affirm his conviction.

## I.  Background Facts & Proceedings.

In September 2017, Greg and Carrie were living together in Marion, Iowa, at a 14th Street address.  They used methamphetamine together on a regular basis.  On September 28, Greg's mother Kathy visited, asking Greg to enter treatment for his mental health and substance use, and he declined.  That night, Greg and Carrie used a significant amount of methamphetamine and got into an argument.  Greg stabbed Carrie twenty-six times, in a variety of deep and shallow cuts.

The next day, Greg called Kathy and said Carrie was "gone" without any explanation.  Greg visited his parents for supper the next evening, and they did not discuss Carrie because a grandchild was also present.  On October 1, Greg drove to his parents' house in his truck hauling an open trailer with a rolled-up carpet in it.  Kathy asked him if Carrie was in the trailer, and Greg admitted she was.  Kathy did not call the police; she did call an attorney.  Greg later drove to another of his parents' properties, the Hillview house, and left the trailer with Carrie's body in it in the carport.  The next day, Kathy called a non-emergency police number and

---

[1] Given both the defendant and the victim are surnamed Davis, we will refer to any party surnamed Davis by their first name.

requested a welfare check at the Hillview house for Carrie. The officer responding to the request found Carrie's body in a roll of carpet on the trailer at the Hillview house. Carrie's credit cards were in pieces on the driveway in front of the trailer. Greg was found at his parents' house and arrested. Greg had Carrie's identification in his wallet; police found pill bottles in his pocket with what appeared to be over-the-counter medicines but no obvious controlled substances or paraphernalia on him, and he did not appear impaired. When she was found, Carrie wore three shirts (a tank top, t-shirt, and sweatshirt), each of which had multiple holes, but only the inner two shirts showed significant amounts of blood.

At the 14th Street house, criminalists discovered a mattress had been lain over a bloodstain on the living room carpet; blood had transferred to the bottom of the mattress. A pair of overalls and a jacket in the laundry room had blood stains on them matching Carrie's DNA, and the washer had a load in it. It is unclear how much clean up Greg did following Carrie's death because the criminalists did not use tests to check for cleaned-up blood, a mop and bucket found at the scene were not tested, no methamphetamine or drug paraphernalia were found, and police did not find blood on any of the knives found at the scene and in Greg's truck.

The police located Greg's pickup at his parents' house. They found a bag in his truck toolbox containing a sweatshirt with significant bloodstains on both sides of one shoulder and arm, a second shirt with blood-soaked areas around the wrists, and shorts with scattered bloodstains on them; DNA profiles could be developed for the sweatshirt and shorts, which matched Carrie, but no DNA could be profiled from the second shirt.

This appeal follows Greg's second trial for Carrie's death.[2] For his second trial, Greg filed a notice of intent to present defenses of insanity and diminished responsibility. Greg waived his right to a jury in his second trial, and the matter was tried to the bench. Much of the trial evidence relevant to this appeal consisted of various expert testimonies, which will be described in the analysis section for purposes of clarity.

After a seven-day trial, the court rendered its verdict from the bench and then filed its written findings of fact, conclusions of law, and verdict. The court denied Greg's motion for directed verdict, decided the defense of diminished responsibility applied and the defense of insanity did not, and found Greg guilty of second-degree murder.

Davis appeals.

## II. Standard of Review

We review questions of statutory interpretation for correction of errors at law. *State v. Childs*, 898 N.W.2d 177, 181 (Iowa 2017). Our review of whether Greg met his burden of proof to establish the insanity defense is for sufficiency of the evidence. *State v. Fetters*, 562 N.W.2d 770, 775 (Iowa Ct. App. 1997); *State v. Belk*, No. 21-1742, 2022 WL 10861390, at *2 (Iowa Ct. App. Oct. 19, 2022). Likewise, our review of whether the State proved beyond a reasonable doubt that stab wounds inflicted by Greg caused Carrie's death is also for sufficiency of the

---

[2] His first jury trial ended in a conviction of first-degree murder, which this court affirmed. *State v. Davis*, No. 19-0214, 2020 WL 2060303, at *9 (Iowa Ct. App. Apr. 29, 2020). Our supreme court subsequently vacated our ruling and reversed his conviction, finding his trial counsel provided ineffective assistance in failing to object to the omission of a cross-reference to the insanity defense in marshaling instruction. *State v. Davis*, 951 N.W.2d 8, 20 (Iowa 2020).

evidence. *See State v. Stendrup*, 983 N.W.2d 231, 242 (Iowa 2022). We review sufficiency of the evidence claims for correction of errors at law. *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014). This standard is "highly deferential to the . . . verdict." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). The evidence is "viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn." *Thomas*, 847 N.W.2d at 442 (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)). "Inherent in our standard of review . . . is the recognition that the [fact finder is] free to reject certain evidence, and credit other evidence." *Id.* (quoting *Sanford*, 814 N.W.2d at 615). "Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021) (quoting *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 393 (Iowa 2010)).

### III.  Analysis

Greg urges two arguments on appeal. First, that his methamphetamine addiction was advanced and his use was involuntary and therefore his methamphetamine-induced psychosis rendered him insane under Iowa law. Second, he asserts the evidence was insufficient to establish beyond a reasonable doubt that Greg stabbing Carrie was the cause of her death instead of a methamphetamine overdose.

### A. Methamphetamine Psychosis

**1. Additional Facts.** Greg challenges the district court's ruling his ingestion of methamphetamine could not be considered as part of his insanity defense. He

argues the initial voluntary choice to use an intoxicating substance "becomes attenuated over time once a serious mental condition develops due to chronic substance abuse" and eventually continued use becomes involuntary. Greg further urges his methamphetamine use has "damaged his brain to the point that he was legally insane."

At trial, Greg relied on the defenses of insanity and diminished responsibility due to methamphetamine consumption. *See* Iowa Code §§ 701.4 (2017) (insanity defense), .5 (intoxication defense). There is no question on this record that Greg ingested a large amount of methamphetamine on the night of September 28, 2017. In the throes of his methamphetamine high, he hallucinated and thought Carrie was possessed by the devil.

**2. Expert opinions.** The defense presented testimony from several experts to establish Greg's diminished responsibility and insanity defenses: Dr. Arnold Andersen, Dr. James Gallagher, Dr. Scott Gershan, and Dr. Arthur Konar. Reports from each of these doctors were submitted as exhibits.

*Dr. Andersen.* Dr. Andersen, a psychiatrist, works for the Iowa Department of Corrections and does court-ordered evaluations. In 2018, he evaluated Greg in respect to his insanity and diminished responsibility defenses and submitted that evaluation as evidence in Greg's first trial. Dr. Andersen opined Greg's use of methamphetamine was voluntary and did not meet the definition of a "diseased" mind, as the definition referenced "mental disorders that arise from internal states," not externally-caused problems like voluntary substance use.

Dr. Anderson found Greg's voluntary methamphetamine use did not cause an enduring mental disease or "settled insanity," and it was waxing and waning

intoxication that caused Greg's behaviors and state of mind. He noted during periods of sobriety and low intoxication, Greg could carry out activities of daily living and "when [Greg] ran out of money he immediately became sober without hallucinations and delusions."

And while it was sometimes true a methamphetamine user would get a compulsion and be unable to stop taking drugs, Greg's intermittent reduction in use and periods of rationality meant it did not appear he had reached that point. Dr. Andersen testified methamphetamine use "was the only identifiable cause" of Greg's psychosis, and Greg's high use caused adverse effects, including delusions and hallucinations. But Greg's substance use disorder was different from progressive, organically developed illness. And he showed no history or predisposition to schizophrenia.

Dr. Andersen noted Greg "was not capable of distinguishing between legal right and wrong. He was capable of distinguishing between moral right and wrong according to his delusional concept of right and wrong." But that state of mind was due to methamphetamine abuse at the time of the crime, not due to prior mental disease. And he did know he was killing Carrie and that she would die. Dr. Andersen's concluding opinion was that Greg did not meet the definition for the insanity defense but did meet the requirements for diminished responsibility.

*Dr. Gallagher.* Dr. Gallagher is a psychiatrist who performed an evaluation of Greg before his second trial. He reviewed Dr. Andersen's initial report, and another 2018 report by Dr. Konar. Dr. Gallagher opined Greg "was insane, psychotic at the time of the charges." At the time of Dr. Gallagher's interview of Greg in 2021, he did not present signs of psychosis, disorganization, disjointed

thinking, paranoid psychosis; he was deliberate and able to converse in a rational manner. When asked about the voluntariness of Greg's methamphetamine use, Dr. Gallagher testified no one was forcing him to take it but he lost control over his ability to contain his use. He testified about reading articles with MRI scans showing the destructive effect to the brain of prolonged methamphetamine use, but the damage did not occur to everyone and he did not have a scan of Greg's brain for comparison. More, when he talked to Greg, there were no symptoms of brain damage—just past psychotic symptoms.

*Dr. Gershan.* In 2022, Dr. Gershan, a psychiatrist, provided a forensic report relevant to Greg's insanity defense using information obtained from Greg, his family members, messages, evidence from the first trial, police records, and other expert reports. In his opinion, at the time of Carrie's death, Greg "was suffering from an acute psychotic state that led him to experience several psychotic symptoms that rendered his reality skewed and confused, and because of that he was unable to decipher, distinguish right from wrong in relationship to the event that took place."

In Dr. Gershan's interviews with him, Greg "reported a host of psychotic symptoms that began to develop in late 2016," including "perceptual disturbances," "intense paranoia, persecutory delusions," and "auditory hallucinations" telling him to hurt or kill Carrie and other people. He diagnosed Greg with "methamphetamine induced psychotic disorder," which resembled schizophrenia as to derangements, hallucinations, and paranoia. But Dr. Gershan acknowledged methamphetamine-induced psychosis is not schizophrenia. Dr. Gershan opined that at the time of the act, Greg "was not capable [of] distinguishing between right and wrong in relation

to this act. Due to his deluded, paranoid and deranged mind at the time of the act, [Greg] could not appreciate that this act would lead to her permanent demise." He noted after a year of sobriety, Greg did not "exhibit any residual psychotic symptoms" and his psychotic state was "in full remission." Dr. Gershan specifically opined Greg was "not . . . feigning symptoms or faking his illness at the time of Carrie['s] death," noting his report of similar symptoms leading up to that time and that feigning such behavior over so much time would be extremely difficult.

Dr. Gershan's testimony explored the voluntariness of ingesting drugs while addicted. He urged addiction disorders limit the person's judgment, logic, insight into their needs, and willingness to seek help. In Greg's case in particular, "the addiction escalated to extreme use, which escalated to psychotic symptoms, which then altered his state of mind and his lack of appreciation between right and wrong." Then, when Greg stopped using in the days after Carrie's death, the methamphetamine in his system metabolized and he started to resolve and recover.

*Dr. Konar.* Dr. Konar is a psychologist who evaluated Greg before his first trial. Greg reported to Dr. Konar that he had been using methamphetamine for about ten years, which roughly corresponds to when he was finishing high school, in a cycle of breaking away for a time then relapsing, entering a spiral when no longer supervised by family. Dr. Konar opined Greg's long-term methamphetamine abuse was a complex disease process. Dr. Konar believed Greg "suffered from a diseased and deranged state of mind in which he was not able to understand the nature and quality of his actions and that he was not able to differentiate between right and wrong" because of his methamphetamine abuse

psychosis. He believed Greg was still suffering from psychosis symptoms several weeks after his arrest during the evaluation; Greg told Dr. Konar he was still having some sensory aberrations.

*Summary.* The experts did not substantively disagree on the facts of the case or that Greg was in a methamphetamine-induced psychosis at the time he stabbed Carrie. And they recognized Greg's substance use problems trace back to numerous surgeries he had as a child and teen to correct a cleft palate and knee injuries, teasing and bullying affecting his self-esteem and mental health, and the pain pills he took during his recoveries, with him entering several treatment facilities as a young man to address his substance use. Their area of disagreement was in the legal conclusion whether methamphetamine ingestion-induced psychosis falls within Iowa's statutory insanity defense. But, "a witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard." *In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005).

**3. District Court Ruling.** In evaluating his defenses, the district court discerned "no substantial disagreement among experts that [Greg] met the criteria for methamphetamine use disorder," that at the time of the stabbing he was acting under the influence of methamphetamine-induced psychosis, and that he lacked the capacity to form specific intent at the time of the stabbing. The court concluded that Greg's "mental condition at the time of the stabbing met the standard for diminished responsibility," and the State had failed to meet its burden on the intent element of first-degree murder but had "established beyond a reasonable doubt all of the elements of second-degree murder."

The court then considered his insanity claim and Iowa's intoxication defense statute before concluding Greg's methamphetamine psychosis "clearly was a temporary condition which resolved quickly" and was "caused by voluntary intoxication and ingestion of methamphetamine." The court also noted Dr. Konar's distinction between an external, substance-induced psychosis in comparison to an inherent illness with internal or organic reasons for psychosis. In considering Greg's experts, the court observed, "While Defendant's experts may have a more contemporary view in opining one suffering from methamphetamine use disorder possess a diseased or deranged condition of the mind, those views are not consistent with the current law in Iowa." More, drug ingestion is "generally a voluntary act" for purposes of the insanity defense and does not excuse one from criminal consequences. Ultimately, the court held, given his "deliberate, organized, and methodical actions to cover up Carrie's death," Greg "failed to prove by a preponderance of the evidence that he did not know the nature and quality of his acts or was incapable of distinguishing between right and wrong," failing to meet his burden to establish the elements required for proof of insanity.

**4. Applicable Law.** The question before us is primarily a legal one on the interplay of Iowa Code sections 701.4 and 701.5—i.e. where insanity and intoxication overlap. Is a psychosis caused by the active use of an intoxicant or drug—methamphetamine in this case—governed by the insanity defense statute or the intoxication statute? With that legal framework, we determine if Greg met his burden to prove by a preponderance of evidence that his condition was within the legal parameters of the insanity defense by applying the sufficiency-of-the-

evidence standard. And our task, as the intermediate appellate court, is to apply "existing legal principles." Iowa R. App. P. 6.1101(3).

Iowa Code section 701.4 codifies what is known as the insanity defense:

> A person shall not be convicted of a crime if at the time the crime is committed the person suffers from such a diseased or deranged[3] condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act. If the defense of insanity is raised, the defendant must prove by a preponderance of the evidence that the defendant at the time of the crime suffered from such a deranged condition of the mind as to render the defendant incapable of knowing the nature and quality of the act the defendant was committing or was incapable of distinguishing between right and wrong in relation to the act.

The insanity defense is distinct from diminished responsibility: "[D]iminished responsibility may be offered as a defense where an accused, because of a limited capacity to think, is unable to form a necessary criminal intent. It differs from the usual insanity situation where illness confuses or distorts the thinking process." *State v. Collins*, 305 N.W.2d 434, 436 (Iowa 1981).

"[I]nsanity is determined at the time of the criminal act, not at the time of trial for the act." *Brewer v. Iowa*, 19 F.3d 1248, 1251 n.2 (8th Cir. 1994); *see Davis*, 951 N.W.2d at 20 ("Sanity is judged at the time of the offense."). But "[t]he surrounding circumstances are probative of [the defendant]'s state of mind at the time of the killing." *State v. Venzke*, 576 N.W.2d 382, 384 (Iowa Ct. App. 1997); *Brewer*, 19 F.3d at 1251 (determining the defendant's evasive actions immediately

---

[3] Deranged is defined as "[b]ehaving in a crazy or dangerous way, usu[ally] as a result of mental illness." *Deranged*, *Black's Law Dictionary* (12th ed. 2024).

after and related statements demonstrated "he understood the nature of his actions and the wrongfulness of the shooting").

Iowa Code section 701.5 limits the use of intoxication as a defense to the negation of specific intent:

> The fact that a person is under the influence of intoxicants or drugs neither excuses the person's act nor aggravates the person's guilt, but may be shown where it is relevant in proving the person's specific intent or recklessness at the time of the person's alleged criminal act or in proving any element of the public offense with which the person is charged.

And the supreme court has not determined whether "temporary insanity by involuntary intoxication" can be a complete defense. *State v. Lucas*, 368 N.W.2d 124, 128 (Iowa 1985); *see State v. Marin*, 788 N.W.2d 833, 837 (Iowa 2010).

Several years before the legislature established intoxication as a statutory limited defense, in *State v. Booth*, 169 N.W.2d 869, 873 (Iowa 1969), the supreme court recognized substance use can have lasting effects on the brain:

> A distinction is made when prolonged extensive use of alcohol damages the brain and 'settled or established' insanity results therefrom. This is treated the same as insanity from any other cause. However, a temporary condition caused by voluntary intoxication, such as is claimed here, does not excuse one from responsibility for his conduct.

The same rule is applied to the use of drugs. *Collins*, 305 N.W.2d at 437 ("Extensive alcoholism or drug addiction can of course lead to a condition for which the defense of insanity might be raised. The situation is to be distinguished from the temporary effects of intoxication for one not so afflicted."); *State v. Hall*, 214 N.W.2d 205, 207 (Iowa 1974) (holding a mental condition resulting from voluntary ingestion of drugs does not constitute a complete defense).

Settled insanity can arise "from the long-term use of intoxicants but [is] separate from immediate intoxication" and is not a temporary condition. *Bieber v. People*, 856 P.2d 811, 815–18 (Colo. 1993) (ruling the settled insanity doctrine conflicts with Colorado's statutory scheme on insanity and intoxication); *see Collins*, 305 N.W.2d at 437 ("[A] temporary inability to distinguish right from wrong, brought on by the [ingestion] of [intoxicants], is not insanity, even though the condition results from the effect of the [intoxicant] aggravating a pre-existing pathological condition not in itself amounting to insanity." (citation omitted)). "[E]vidence of temporary intoxication . . . is received, not to show settled or fixed intoxication amounting to insanity, but merely to cast whatever light it might for the jury's deliberations on the defendant's specific criminal intent." *Collins*, 305 N.W.2d at 437. In other words, the temporary psychosis brought on by active drug use is distinct from the longer-term settled insanity caused by physiological effects of chronic drug use which continue beyond the period of intoxication. Our supreme court has not meaningfully examined the doctrine nor applied it in the last forty years, though it has recently been raised in cases at our court. *See, e.g., State v. Henry*, No. 21-0075, 2023 WL 381184, at *3–6 (Iowa Ct. App. Jan. 25, 2023); *Belk*, 2022 WL 10861390, at *3.

The defendant must establish a more pervasive settled or established insanity rather than simply episodic drug use. *See Booth*, 169 N.W.2d at 873; *Belk*, 2022 WL 10861390, at *3. The ability of the defendant to return to sane mental functioning, and the speed at which the stabilization occurs after removal of the drug can be a relevant consideration. *See Belk*, 2022 WL 10861390, at *3. And, regardless of whether the defendant's intoxication is voluntary or involuntary,

we have held "intoxication, involuntary or not, does not provide [the defendant] with a complete defense." *State v. Bibler*, No. 19-0314, 2020 WL 2987995, at *4 (Iowa Ct. App. June 3, 2020); *see also Houston v. State*, No. 14-1632, 2015 WL 4642520, at *3 (Iowa Ct. App. Aug. 5, 2015) (determining counsel was not ineffective for not raising involuntary intoxication as a defense as it was a "meritless" claim).

**5. Conclusions.** Greg's argument is deceptively simple: a defendant may be both intoxicated and insane (and that insanity might be caused by long-term use of the intoxicant). And he presented expert testimony that long-term methamphetamine use may cause physiological damage resulting in a mental condition that would qualify as settled insanity for purposes of the defense. But Greg did not present evidence he suffered from physiological damage to his brain. Nor is he basing his insanity claim on physiological damage alone.

Instead, relying on the brain disease model of addiction highlighted by his experts, Greg argues the psychosis from his methamphetamine intoxication combines with his longer-term addiction to meet the statutory criteria of the insanity defense. Greg suggests his substance use disorder qualifies as a brain disease, one strong enough to render his use of methamphetamine involuntary. And, because his methamphetamine intoxication was not voluntary and he was experiencing a methamphetamine-induced psychosis when he stabbed Carrie, he was incapable of distinguishing between right and wrong due to his brain disease of addiction. He produced evidence of near-constant intoxication at varying levels in the time leading up to Carrie's death, and his hallucinations and other derangements flowed from that intoxication. And there was no testimony or

evidence Greg would have taken the actions he did if he had not been in the throes of intoxication.

First, we note that even if our case law recognized involuntary intoxication as a complete defense—which it currently does not—we are not convinced addiction is sufficient to render intoxication legally involuntary within the meaning of section 701.5. *See Bibler*, 2020 WL 2987995, at *4 (noting no statutory distinction between voluntary and involuntary intoxication under section 701.5 and holding involuntary intoxication does not provide a complete defense). *Black's Law Dictionary* defines involuntary intoxication as "[t]he quality, state, or condition of having ingested alcohol or drugs against one's will or without one's knowledge." *Intoxication*, *Black's Law Dictionary* (12th ed. 2024). There is no indication Greg did not know he was taking methamphetamine that night, or that he was forced to do so by another. Rather, Greg had refused earlier that night to leave with his mother and enter treatment for his addiction and then proceeded to take a substantial amount of methamphetamine with Carrie. We do not find his ingestion of methamphetamine the night of September 28, 2017, was against his will or without his knowledge. As such, he was in a state of voluntary intoxication at the time of his actions.

And viewing the evidence in a light most favorable to the verdict, the district court could rationally find Greg failed to prove a more pervasive settled or established insanity rather than simply episodic drug use. *See Belk*, 2022 WL 10861390, at *3. Although Greg suffered from methamphetamine use disorder, Greg knew he was using methamphetamine, and he used it voluntarily in the sense that he was not tricked, coerced, or forced to do so. After he turned

down his mother's plea for treatment, Greg used with Carrie to the point of intoxication, and they got into a fight. While Greg suffered from a methamphetamine-induced psychosis when he stabbed Carrie, he did not suffer from an organic brain disease such as schizophrenia. Greg's psychosis was temporary in nature and resolved relatively soon after he stopped using. Greg did not establish he had a deranged of diseased condition of the mind within the meaning of section 701.4.

Further, our case law is clear that the "temporary inability to distinguish right from wrong, brought on by the [ingestion] of alcohol [or drugs], is not insanity." *See Collins*, 305 N.W.2d at 437 (citation omitted). Despite his delusions, Greg knew what he was doing when he repeatedly stabbed Carrie, and he knew it was wrong to kill her. *See State v. Hamann*, 285 N.W.2d 180, 183 (Iowa 1979) (stating the words "right" and "wrong" under our statute's codification of the *M'Naghten* rule of insanity "should be understood in their legal and not in their moral sense"). Greg's actions after the homicide demonstrate he knew the nature of his act and that it was wrong to kill Carrie. *See State v. Wheeler*, 403 N.W.2d 58, 62 (Iowa Ct. App. 1987) ("Defendant's evasive actions after committing the crimes is adequate circumstantial evidence supporting the trial court's determination he understood the nature of his acts and to some degree knew his actions were wrongful."), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22 (Iowa 2001). Greg covered up the crime by placing a mattress over the blood on the carpet, rolling the blood-soaked body in blankets and carpet, putting it in his trailer, pulling the trailer to his parents' home and then into the carport at another house, and hiding

his bloody clothes in his truck and the laundry. He wrote a confession and then tried to destroy it. Greg told his mother Carrie was "gone" the day after the murder.

Substantial evidence establishes Greg was capable of knowing the nature and quality of his act and he was capable of distinguishing between right and wrong in relation to his act under section 701.4. Greg's methamphetamine psychosis, arising from a voluntary intoxication, was not insanity for purposes of the defense. *See Booth*, 169 N.W.2d at 873. This is in keeping with the principle: "Temporary drug intoxication does not constitute a complete defense in a homicide case." *Collins*, 305 N.W.2d at 437. The court appropriately considered the psychiatric and psychological opinions of the experts while coming to its own legal conclusions.

Based on our interpretation of the controlling statutes and case law, and considering the evidence in the light most favorable to the verdict, we find sufficient evidence supports the district court's conclusion that Greg failed to prove insanity by a preponderance of the evidence. We affirm the district court's ruling on the inapplicability of the insanity defense.

**B. Insufficient Evidence of Causation.**

Greg also asserts there was insufficient evidence to convince a rational fact-finder that Carrie died from the injuries inflicted by Greg rather than an overdose. He further asserts the court relied on inaccurate evidence and ignored exculpatory evidence.

In his interview with officers the day of his arrest, and in at least one of his psychiatric evaluations, Greg related he and Carrie were having a verbal fight and she had struck him before he stabbed her. Dr. Konar observed it was conceivable

at the time he stabbed her "that [Greg] would not know whether she was alive or dead."

**1. Expert opinions.** The court heard testimony from several experts regarding the physical cause of Carrie's death: Dr. Jonathan Thompson, who conducted Carrie's autopsy; and three experts for the defense, Dr. Cyril Wecht, Dr. Craige Wrenn, and Dr. James O'Donnell. In addition to the experts, we note a criminalist who gathered evidence from the scene and performed testing on the blood admitted not knowing and having no way to test if the blood came from Carrie when she was alive or from post-death seepage.

*Dr. Thompson.* Dr. Thompson is a forensic pathologist serving as Iowa's deputy state medical examiner. His primary job duty is to perform autopsies—around 250 per year. Dr. Thompson opined, "Carrie died of multiple sharp force injuries." In all, Greg stabbed Carrie over twenty times: in the head twice, across her upper back seven times, her left leg, left and right shoulders and upper arms, and her right hand. Dr. Thompson noted one stab wound to the back of Carrie's head penetrating the scalp and through her skull, which "would take a good amount of force" to do. Two of the back wounds were deep enough to enter Carrie's lung, two more penetrated the muscle, and most of the remaining wounds only penetrated the skin. She had 400 milliliters of blood in her chest cavity from the wounds at the time of autopsy (one week after death) in addition to the external blood evidence on her clothing, Greg's clothing, and other items.[4] Dr. Thompson stated the total blood loss from her wounds would have been sufficient to kill Carrie.

---

[4] There may have been a greater amount of blood in her lungs at the time of death due to evaporation in the week between her death and autopsy.

Carrie's back injuries were "oriented in multiple directions, and they all have various depths of penetration." Dr. Thompson stated the multiple directions of the wounds and the variety of locations indicated Carrie or Greg was likely moving at the time of the incident. He noted there were wounds on Carrie's back, her left side, right side, front and back of her arms, and front, indicating movement. The wounds on Carrie's hand and the inside of her upper arm "would be consistent" with defensive wounds.

Some of the blood found in Carrie's chest cavity and some of her urine was sent for toxicology tests. Dr. Thompson cautioned the blood might have had a higher concentration of drugs result as a result of postmortem redistribution of blood and the time between death and the autopsy. Carrie had a high level of methamphetamine in her blood, which "would suggest . . . that Carrie was using methamphetamine shortly prior to her death, at least probably that day." Carrie's urine tested positive for amphetamines and fentanyl. And he agreed he would have attributed Carrie's death to methamphetamine toxicity as "the only potential cause of death" given a lack of evidence of natural disease "if she did not have all those holes in her body." While Dr. Thompson considered any level of methamphetamine to be potentially lethal, he testified methamphetamine did not at all contribute to Carrie's death—the sharp force injuries caused her death. He did allow if, at the same time as she was stabbed, Carrie had taken methamphetamine and it started a fatal cardiac arrhythmia, the arrhythmia would have killed her before she bled out. But there is no way to tell in an autopsy if she had a heart arrhythmia at all.

*Dr. Wecht.*[5] Dr. Wecht's testimony came in via a videotaped deposition and transcript provided to the court, and his report was submitted as an exhibit. He is a forensic pathologist and medicolegal consultant. He reviewed the "autopsy report, photographs, toxicology report . . . [and deposition] testimony by the pathologist who did the autopsy." Dr. Wecht opined Carrie "died as a result of acute drug toxicity, methamphetamine and amphetamine." Further questioning revealed that Carrie's methamphetamine levels were above a "threshold" toxicity level, but that people could also have a higher level than Carrie without suffering acute toxicity. Dr. Wecht testified twenty-three of the twenty-six stab wounds "were essentially of little or no consequence." And he opined the other wounds were not lethal, the blood loss was not significant enough to result in death, and Carrie would have bled more from the wounds if she had been alive when they were inflicted. Dr. Wecht testified there was "a paucity of blood." But he admitted he did not see crime scene photographs showing blood or lack of blood. Dr. Wecht found the wound positions to indicate Carrie was lying "in a prone, face down position"

---

[5] Greg urges us to reject the district court's credibility finding to review Dr. Wecht's video deposition de novo instead of for correction of legal error—our normal standard of review. While it is true we watch the same video, we do not watch from the same context of having evaluated the other experts in person, and we are not convinced presenting testimony via video instead of in court should change our deference to the fact-finder's determinations. *See* Eric J. Magnuson & Samuel A. Thumma, *"Same As It Ever Was": Why Audio-Video Recordings In and of Trial Court Proceedings Should not Change the Standard of Appellate Review*, 24 J. App. Prac. & Proc. 213, 215 (2024) ("[T]he format of evidence being challenged or providing the basis for a challenge on appeal should not alter the standard of appellate review."). As the district court was able to witness the demeanor of *all* the experts and the parties, we defer to the court's credibility determinations. *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) (explaining why we defer to the factfinder's credibility determinations).

instead of moving around, stating her body could have been moved by Greg while stabbing, or through "involuntary spasmodic movements" as she was dying.

*Dr. Wrenn.* Dr. Wrenn is a pharmacologist and testified there was sufficient methamphetamine in Carrie's system to result in death. He testified death from methamphetamine could be fast—with a cardiac arrest or large stroke in the brain—or slow in the case of a small brain bleed or small stroke. He cautioned "[l]ethal amounts of [drugs] will vary from person to person." While he opined "there was enough methamphetamine in her system to result in death in most people," he could not testify that it *did* cause her death. He also agreed "there are times when people do not die from methamphetamine levels that are higher than the level that Carrie . . . had."

*Dr. O'Donnell.* Dr. O'Donnell is also a pharmacologist. He testified about methamphetamine's status as a nervous system stimulant and that people abusing it "can be up for days" and exhibit significant behavior changes. He testified Carrie's methamphetamine levels were "[c]learly in the lethal range for an individual." He agreed some people with higher levels survive. Although not a pathologist, Dr. O'Donnell offered his opinion that Carrie died from methamphetamine, but he also believed she would have died from her injuries if not for the methamphetamine.

**2. Conclusions.**

We generally defer to the fact finder's evaluation of testimony. *See State v. Fetters*, 562 N.W.2d 770, 775 (Iowa Ct. App. 1997) ("[T]he reviewing court will 'not determine anew the weight to be given trial testimony.'" (citation omitted)). "The trial court as trier of fact is not obligated to accept opinion evidence, even from

experts, as conclusive." *State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000); *see Venzke*, 576 N.W.2d at 384 ("When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as the district court is in a better position to weigh the credibility of the witnesses.").

The district court found parts of Dr. Wecht's testimony "to lack credibility in substance and demeanor." In particular, the court found Dr. Wecht's suggestion Carrie sustained defensive-type wounds and wounds on both sides of her body as a result of involuntary spasms and movement of the body by the stabbing person as "[p]articularly incredible." Instead, the court found the location and nature of Carrie's wounds and the bloodstains found were "consistent with some type of struggle before her death and do not support a finding that she sustained the wounds after her death." It was reasonable for the court to accept Dr. Thompson's testimony in this regard. The court also noted statements by Greg to psychiatrists and psychologists strongly suggested Carrie was not dead already when he stabbed her. In ruling on Greg's motion for new trial, the court explained further the lack of an accurate estimate of how much blood Carrie lost from the stabbing "was as a result of the actions of" Greg in his movement of the body and the delay in reporting Carrie's death.

Greg presented a significant amount of evidence that the amount of methamphetamine in Carrie's system *could* have been lethal. But that evidence was tempered by equal testimony that there is no set level of methamphetamine that is always lethal and that higher levels of methamphetamine are survivable. Nor did any expert examining the autopsy report note any physical indicators to indicate methamphetamine overdose caused death. On the other side, Greg's

statements to law enforcement and his mental health evaluators do not indicate Carrie was dead before he stabbed her. Out of over two dozen stab wounds, one pierced Carrie's her skull, two wounds punctured her lung, they are in multiple directions all over her body, and some indicate defensive actions. Carrie had significant internal bleeding, and her external bleeding spread across both her and Greg's clothing, with her fingers covered in blood and around her nose and mouth. And it is difficult to estimate her external bleeding given the relocation of her body and Greg's actions.

While the evidence could have supported a finding involving overdose, our review is to determine if the evidence "supports the finding actually made, not whether the evidence would support a different finding." *Jones*, 967 N.W.2d at 339. Considering all the evidence, we find substantial evidence supports the district court's finding Carrie died as a result of being stabbed. We therefore affirm.

**AFFIRMED.**