MANSFIELD, Justice.
We are asked to decide today whether substantial evidence supports the defendant’s convictions for possession of marijuana and crack cocaine with intent to deliver. After police entered an apartment occupied by several individuals, the defendant and one other person ran into the bedroom. The defendant tried to hold the bedroom door shut to prevent the police from entering. Eventually, an officer was able to force open the door. As the defendant attempted to engage in misdirection, police noticed the presence of sale packages of marijuana and crack cocaine in the area where the defendant had been standing and holding back the door. The defendant then gave a false name to the officers and falsely claimed he had fled from them because he had an outstanding warrant. Meanwhile, the other person who had run into the bedroom and the renter of the apartment both denied having anything to do with the drugs. Based on these facts, the jury found the defendant guilty of possession with intent to deliver, but the court of appeals reversed for insufficient evidence. On further review, we find the evidence sufficient to sustain a jury verdict of guilt and therefore reinstate the defendant’s convictions.
We also reject, separately, the defendant’s claim of Batson error in jury selection. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We *440 uphold the district court’s finding that the State provided a race-neutral explanation for striking a potential alternate juror.
I. Background Facts and Proceedings.
The following facts were presented to the jury. The defendant Tremayne Thomas and Marissa Ledbetter stood outside the Davenport apartment of Raymond Norvell late in the evening of March 1, 2012. Norvell’s apartment was a ground-level, one-bedroom apartment.
Officers from the Davenport Police Department, in a foot pursuit of a suspect in the area, noticed Thomas and Ledbetter shouting and heard loud noise coming from a window of Norvell’s apartment. The officers inquired about the activity, but Thomas and Ledbetter assured them there was no problem. Thomas and Ledbetter then moved inside the apartment. One of the officers went to the door and was met by Norvell, who identified himself as the resident of the apartment. Norvell reassured the officer everything was fine, and the officers continued in pursuit of their suspect.
A few minutes later, the officers returned to the area outside Norvell’s apartment and again heard yelling from the window. One of the officers approached the window. As the officer watched, a man later identified as Isaiah Henderson came into view, standing next to the kitchen microwave in the background of the scene. The officer testified he observed Henderson pull a marijuana blunt from his sweatshirt and begin smoking it.
Moments later, a man later identified as Brett Dennis approached Norvell’s apartment. The officers followed Dennis toward the door and noted the smell of marijuana smoke wafting from the apartment when the door opened. The officers decided to attempt to seize the marijuana, so they quickly knocked and announced themselves and entered the apartment.
The apartment had two rooms — the kitchen (with a small attached bathroom) to the east and a back bedroom to the west. A single door connected the kitchen and the bedroom. The door was located in the northeast corner of the bedroom and swung into the bedroom toward the north wall.
As the police announced their presence and entered the front room of the apartment in uniform, six persons were in that room. No one was in the bedroom. Three of those persons — Norvell, Ledbet-ter, and Derek Townsend — remained in the front room, sitting at the kitchen table. Dennis, who had just walked in, eventually got up from the kitchen table and left the residence. None of those four appeared to be interested in fleeing or hiding.
In contrast to those four, Henderson and the defendant Thomas quickly retreated from the front room to the bedroom in back. Henderson left his blunt behind and went immediately to the southwest corner of the bedroom — i.e., the opposite end of the bedroom from where the door was located. Henderson then stayed in that corner of the bedroom, away from the door and near a dresser. Thomas followed Henderson into the bedroom, closed the door, and tried to hold it shut.
One of the police officers, Officer Sie-vert, pushed against the door to the bedroom. Despite Thomas’s efforts to hold the door shut, after several seconds, the officer was able to shoulder the door open. The officer ordered Henderson (still in the southwest corner) and Thomas (still in the northeast corner) to the ground. Henderson immediately complied. Thomas, however, remained standing and tried to engage the officer in discussion. The officer believed this was an effort at “mis *441 direction.” In any event, the officer had to force Thomas to the ground. The two men were then moved to the bed in the bedroom as the officers searched the room.
Behind the door that Thomas had been holding back and along the north wall near the northeast corner were two rows of neatly placed women’s purses belonging to Norvell. On top of the purses, police found a clear plastic baggie that contained four individually wrapped bags of marijuana and four individually wrapped bags of crack cocaine. The marijuana bags were $5 units, and the crack cocaine bags were $50 rocks, all prepackaged for sale.
The officers also found a phone and prescription medication belonging to Henderson on a dresser near the corner of the room where Henderson had initially been standing. Henderson explained that he had previously entered the back bedroom to charge his cell phone and had left his charging cell phone and a bottle of prescription pills on the dresser in the southwest corner. When the police came in, he admitted he had disposed of the blunt and headed back to that southwest area of the bedroom where the dresser with his cell phone and pills was located.
Thomas had no weapon or other contraband on his person. He did have $120 cash. The other persons who had been in the apartment had no money or contraband on their persons. In addition, Nor-vell denied any knowledge of the crack cocaine found in his bedroom. Henderson also denied any knowledge of the drugs found in the bedroom.
The packaging of the marijuana and crack cocaine was crinkled, so the police did not expect to find any fingerprints on the baggie or the bags. Although they checked all items for fingerprints, no fingerprints were subsequently detected.
The officers located a marijuana blunt in front of the microwave where Henderson had initially been standing when the officers observed him light the blunt from outside the window. A spoon with cocaine residue on it and several small, clear plastic bags were also located at the table where Norvell, Ledbetter, and Townsend were sitting.
After the police completed a search of the apartment, Thomas and Henderson were asked for identification. Henderson identified himself correctly to the officers, but Thomas gave a false name and claimed he could not remember his Social Security number. Thomas only gave his actual name when he was moved to the squad car and told he was under arrest for the evidence found in the bedroom and would be held as a “John Doe” until he could be identified through fingerprints.
Thomas claimed he had not been forthcoming about his name because he had an outstanding warrant for his arrest. However, the police checked, and there was no warrant. One of the officers later testified that it is “pretty typical” for a suspect to claim that he or she ran because of a warrant “so you won’t have to acknowledge the presence of drugs.”
Thomas was charged with possession with intent to deliver marijuana, possession with intent to deliver crack cocaine, a drug tax stamp violation, and interference with official acts. See Iowa Code § 124.401(l)(c )(3) (2011) (possession of crack cocaine); id. § 124.401(l)(d) (possession of marijuana); id. § 453B.3 (drug tax stamp violation); id. § 719.1(1) (interference with official acts). The drug tax stamp charge was eventually dropped. Thomas entered a plea of not guilty to the remaining charges in March 2012, and the case went to trial in July.
At the close of the two-day trial, Thomas moved for a directed verdict on the posses *442 sion with intent to deliver charges, arguing there was insufficient evidence he had possessed the drugs in question. The district court denied the motion. The jury found Thomas guilty of all three charges. Thomas was sentenced to a period of imprisonment not to exceed ten years for the crack cocaine charge, a period not to exceed five years for the marijuana charge, and thirty days for the interference with official acts charge. The court ordered the sentences to run concurrently. Additionally, Thomas was fined $1750 and ordered to pay court costs and attorney fees.
Thomas appealed and urged again that there was insufficient evidence to support the possession with intent to deliver charges. The court of appeals agreed with Thomas and set aside those convictions. We granted the State’s application for further review.
II. Standard of Review.
We have recently summarized our standard of review when reviewing the sufficiency of evidence in criminal cases as follows:
Sufficiency of evidence claims are reviewed for ... correction of errors at law. In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpa-tory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.
State v. Sanford, 814 N.W.2d 611, 615 (Iowa 2012) (citations omitted) (internal quotation marks omitted).
III. Analysis.
Iowa Code section 124.401 makes it unlawful for any person “to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance.” Iowa Code § 124.401(1). In order for the State to establish possession of a controlled substance under this statute, it had to prove Thomas “exercised dominion and control over the contraband, had knowledge of the contraband’s presence, and had knowledge the material was a narcotic.” State v. Kern, 881 N.W.2d 149, 160 (Iowa 2018) (citation omitted) (internal quotation marks omitted).
The State may show the defendant had either “actual possession” or “constructive possession.” Id. at 160-61. At times, we have said that actual possession requires the contraband to be found on the defendant’s person. See id. at 161; State v. DeWitt, 811 N.W.2d 460, 474 (Iowa 2012). Elsewhere, we have said that an individual has actual possession when the contraband is found on his or her person or when substantial evidence supports a finding it was on his or her person “at one time.” State v. Vance, 790 N.W.2d 775, 784 (Iowa 2010). In other words, “[a]ctual possession may be shown by direct or circumstantial evidence.” Id.
Under the Vance formulation, the distinction between actual possession and constructive possession does not turn on whether a defendant was apprehended with the contraband, but on whether there is sufficient evidence that contraband was in his or her physical possession at some point in time. See id.; see also United *443 States v. Cantrell, 530 F.Sd 684, 693 (8th Cir.2008) (“A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.”); 8th Cir.Crim. Jury Instr. § 8.02 (rev. ed.2013) (setting forth the same language). In Vance, the pseudoephedrine in question was not found on Vance’s person at the time he was stopped, but there was evidence that a pharmacy had sold pseu-doephedrine to an individual who had produced Vance’s identification card. 790 N.W.2d at 784. In addition, among other things, Vance was the only person in the vehicle, the vehicle contained recently manufactured methamphetamine, a receipt for the pseudoephedrine was on the front driver’s side of the vehicle, and Vance had the same identification card on his person. Id. Based on this and other evidence, we found a jury “could reasonably infer Vance had actual possession of the pseudoephed-rine pills.” Id.
In any event, the doctrine of constructive possession allows the defendant’s possession of contraband to be inferred based on the location of the contraband and other circumstances. Id. When drugs are found on premises in the exclusive possession of the accused, that may be enough to sustain a conviction. See Kern, 831 N.W.2d at 161; DeWitt, 811 N.W.2d at 474 (noting “possession may be inferred if the defendant is in exclusive possession of the premises in which the contraband was located”). But where the premises are jointly occupied, additional proof is needed. See Kern, 831 N.W.2d at 161; DeWitt, 811 N.W.2d at 474-75. We have identified the nature of the additional proof as follows:
“(1) incriminating statements made by a person; (2) incriminating actions of the person upon the police’s discovery of a controlled substance among or near the person’s personal belongings; (3) the person’s fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance.”
Kern, 831 N.W.2d at 161 (quoting State v. Maxwell, 743 N.W.2d 185, 194 (Iowa 2008)). These factors are not exclusive, however, and merely act as a guide. See DeWitt, 811 N.W.2d at 475; Maxwell, 743 N.W.2d at 194.
Thomas, of course, did not have exclusive access to the bedroom where the drugs prepackaged for sale were found. But we believe a reasonable jury could conclude beyond a reasonable doubt that he had been in possession of them and dropped them from his person shortly before the police entered the room. To begin with, the drugs were found where Thomas had been holding the door back from the police. Also, no other logical explanation exists for Thomas’s behavior. He had no weapon and, despite his claim to the contrary, no outstanding warrants. To all appearances, what Thomas was doing when he held back the door was buying time. Holding back the door would not have made sense if Thomas’s goal had been to get away from the police, but it made perfect sense if his goal was to get drugs off his person before the police got to him.
Of course, Norvell and Henderson also had connections to the bedroom. However, both of them denied any knowledge of the drugs. Henderson repeated his denial on the stand at trial. Additionally, neither Norvell nor Henderson offered any resistance or acted inappropriately in their dealings with the officers. Furthermore, if Norvell were the culprit, it would have been odd for him to leave drugs for sale sitting in plain view on top of two rows of purses neatly resting on the floor of his *444 bedroom.[1] And Henderson had been in the other end of the bedroom from Thomas and the drugs.
In short, drugs were found in close proximity to the defendant; the defendant had taken actions explainable most logically as an effort to get the drugs off his person; and when apprehended, the defendant made false statements and engaged in misdirection. In addition, there was evidence tending to exclude the other two individuals who were known, to have been in the bedroom from responsibility for the drugs.
The facts of this case can be compared to our recent drug-possession cases. In Kern, the defendant lived in a house with her boyfriend who maintained an extensive marijuana grow operation. 881 N.W.2d at 157, 160, 162. Although the evidence readily permitted an inference that the defendant knew about the marijuana, “there was no evidence that Kern was more than an agreeable bystander to a vast operation she permitted to take place.” Id. at 162. The record lacked evidence pointing to the defendant’s “dominion and control over the marijuana.” Id. As we pointed out, “Our long-standing rule does not permit an inference of dominion and control based only on the presence of drugs in a jointly occupied premises.” Id. Accordingly, we reversed the defendant’s conviction for possession of marijuana. See id. Unlike in Kern, several facts here — including the specific location where the drugs were found and Thomas’s own actions — allow a jury to conclude that Thomas personally exercised dominion and control over the drugs.
In DeWitt, officers found marijuana in the trunk of a car the defendant had been driving but did not own. 811 N.W.2d at 466, 474-75. The uncontested evidence showed five other individuals had access to the vehicle. Id. at 475. Nonetheless, we found the sum total of the evidence sufficient to support the defendant’s conviction. Id. at 477. This evidence included the fact that the defendant was the most recent driver of the car and drove it frequently, suspicious activity by the defendant, the defendant’s resistance to law enforcement, and information provided by a confidential informant as to which no hearsay objection had been made. Id. at 475-77. A number of the same factors are present here. The defendant was the person who had been most recently in the spot where the drugs were found, his conduct prior to his arrest was highly suspicious and makes sense only if his goal was to get the drugs off of his person, and he offered resistance.
Maxwell likewise involved drugs found in a vehicle. 743 N.W.2d at 189. In that ease, Maxwell had been driving a vehicle that had an empty pack of cigarettes between the two front seats. Id. The pack turned out to contain crack cocaine. Id. A full pack of the same brand of cigarettes was found on Maxwell’s person. Id. Maxwell, however, did not own the vehicle. Id. We nonetheless found that Maxwell was not entitled to a new trial after he was convicted of possession. Id. at 195. We emphasized that Maxwell was the driver and the only person in the car at the time of the stop, that the pack containing the drugs was in Maxwell’s plain view, that the drugs were found immediately next to Maxwell between the two front seats, and that Maxwell continued to drive for one hundred feet and then pulled into his driveway and got out of the car when the officer activated his lights. Id. at 194. Again, some of the same factors linking *445 the defendant to the drugs are present here. In this case, the drugs were found in the spot where the defendant had just been, and his behavior was not merely mildly suspicious (as in Maxwell), but highly indicative of an effort by the defendant to get the drugs off his person.
In State v. Nitcher, the defendant had been staying at a house for a few days because he had an argument with his girlfriend. See 720 N.W.2d 547, 551 (Iowa 2006). Nitcher was not the owner of the house, and several other individuals were also occupying the house. Id. at 550-51. The house contained a meth lab. Id. at 550-52. In finding sufficient evidence that Nitcher had constructively possessed methamphetamine, we emphasized that his clothing contained an ether smell, and his fingerprint was on a pie plate containing pseudoephedrine. Id. at 559. The court also noted that the manufacturing process had occurred recently. Id. As we explained, “This constitutes substantial evidence to support the jury’s finding as to the possession link between Nitcher and the methamphetamine when viewed in the context of the other evidence in the case.” Id. Here, too, despite the fact that the apartment and the bedroom were not in Thomas’s exclusive possession, there was substantial evidence linking Thomas personally to the drugs.
State v. Carter was another vehicle case. See 696 N.W.2d 31, 34-35 (Iowa 2005). Carter, the driver of the vehicle, engaged in evasive driving and made movements with his right hand when police tried to initiate a traffic stop. Id. at 34. He also gave a false name when police ultimately stopped the vehicle. Id. at 35. A baggie containing individually wrapped bags of crack cocaine was found in the center console of the car, the same area toward which Carter was seen moving his hand before the stop. Id. Carter had only $6.09 on his person and no cell phone, pager, or drug notes. Id. The passenger, on the other hand, had also been riding in the front of the vehicle and was found with $295.75 on his person. Id.
Carter argued the evidence was insufficient to sustain his conviction. Id. at 36. He pointed out that “the center console was close and equally accessible to the driver and the passenger,” he was not the owner of the vehicle, there were no fingerprints on the drug package, and he had no drug paraphernalia on his person. Id. at 40. Yet we found the evidence sufficient to convict Carter based on (1) his suspicious activity before and after the stop; (2) the proximity of the controlled substances to where he was rummaging while police were attempting to stop the vehicle; (3) the presence of the baggie in a location where one would not ordinarily leave drugs; and (4) the passenger’s denial that the drugs were his, combined with the passenger’s cooperation with police. Id. We concluded the fact finder “could reasonably infer that Carter was exhibiting a proprietary interest in the controlled substances by desperately trying to hide them while the police were pursuing him.” Id. at 41.
This case is in many respects a reprise of Carter. As in Carter, the defendant here did not own and was not in exclusive possession of the place where the drugs were found. However, he was engaged in conduct that appeared to be an effort to avoid being caught with contraband, he then gave a false name to police when caught, and the contraband was found where the defendant had been making his suspicious movements just before he was apprehended (and it would have been otherwise odd for contraband to be there). Furthermore, the other person who was in the same room denied any connection to the contraband and had not engaged in *446 suspicious activity. Thus, as in Carter, we believe the evidence is sufficient to sustain the convictions.
In State v. Henderson, we upheld the defendant’s convictions for drug possession following law enforcement’s entry for eviction purposes into an apartment she jointly occupied with a roommate. See 696 N.W.2d 5, 8-10 (Iowa 2005). Various drugs and drug-related items were found. Id. at 8. In our view, the defendant’s vehement reaction to the entry “implied guilty knowledge,” whereas the roommate’s “obliging manner” did not. Id. at 9. We acknowledged that “one could also explain defendant’s response to the situation by the fact that she was the object of a forcible eviction from her residence,” but we noted that the roommate had denied the drugs were hers. Id. We believe the evidence here linking Thomas personally to the drugs, if anything, exceeds the evidence we remarked upon in Henderson. Cf. State v. Kemp, 688 N.W.2d 785, 787, 790 (Iowa 2004) (finding sufficient evidence to sustain a potential conviction when marijuana was found in a car that defendant owned and had been the most recent person to drive, although defendant was working on the vehicle with two other individuals and another individual was inside the vehicle as a passenger when police arrived).
By contrast, in State v. Bash, we had a ile-ra-type situation. See 670 N.W.2d 135 (Iowa 2008). The husband had a box containing marijuana on his nightstand on his side of the bed. Id. at 136. The wife testified she did not know what was in the box but admitted she knew the box had contained marijuana in the past. Id. at 136-37. In finding the evidence insufficient to sustain the wife’s conviction for possession, we noted the absence of evidence that she had any right to control the box or the marijuana in it. Id. at 138-39. In short, like Kern and unlike here, the evidence indicated at most that the defendant knew of the contraband, not that she had ever exercised control over it. See id.
In State v. Cashen, we also reversed a possession conviction for insufficient evidence. See 666 N.W.2d 566, 568 (Iowa 2003). In that case, a car with six people was stopped by law enforcement. Id. Four passengers were sitting in back, including the defendant Cashen who had his girlfriend on his lap. Id. A baggie of marijuana was found wedged into the rear seat on the side where the defendant and his girlfriend had been seated. Id. The girlfriend admitted the marijuana was hers. Id. The defendant had a lighter and rolling papers on his person; the girlfriend had rolling papers and a small baggie of marijuana seeds in her pocket. Id. The defendant was not the owner of the car, nor did he behave suspiciously when the car was stopped. Id. at 572. In determining that the evidence was insufficient to allow a jury finding of Cashen’s guilt, we emphasized that on the question of dominion and control the State had only Cash-en’s proximity to the drugs, and “[t]he other three passengers riding in the back seat were just as close to the drugs as was Cashen.” Id.
This case stands in contrast to Cashen. As we have already discussed, the defendant here was the last person present in the actual location where the drugs were found, the evidence supports an inference that the defendant dropped them there, the defendant’s conduct was highly suspicious, and others denied responsibility for the drugs.
Finally, State v. Webb involved another Kern scenario. See 648 N.W.2d 72, 79-81 (Iowa 2002). Three adults shared an apartment. Id. at 75. Marijuana was found in the kitchen and the living room. Id. Webb was not in the apartment when *447 the police arrived, nor did he engage in suspicious conduct, nor were any of the relevant items found near or among his belongings, nor was there any evidence as to when he had last been in the apartment. Id. at 79-80. Webb did have $836 on his person when he subsequently arrived at the apartment, but he said he had received the money from his roommate. Id. at 80. In sum, we assumed there was sufficient evidence that Webb knew about the marijuana but found insufficient evidence that he had the ability to maintain control over it. See id. at 81. This case, on the other hand, puts the defendant most recently in the location where the marijuana had been found, with considerable circumstantial evidence that he had dropped it there.
“Direct and circumstantial evidence are equally probative.” Iowa R.App. P. 6.904(3)(p); State v. Schrier, 300 N.W.2d 305, 308 (Iowa 1981). This rule applies to possession cases. See State v. Welch, 507 N.W.2d 580, 583 (Iowa 1993). Considering the totality of the evidence in this case, it is sufficient to raise a “fair inference of guilt” and generates “more than suspicion, speculation, or conjecture.” DeWitt, 811 N.W.2d at 475. As the foregoing review of our recent drug possession caselaw indicates, the present case fits comfortably among our precedents where we have found the evidence sufficient to sustain a finding of guilt.
Thomas, who is African-American, also urges that his constitutional rights were violated when the State struck the only minority from a panel of three potential alternates in his case. See Batson, 476 U.S. at 96-98, 106 S.Ct. at 1723-24, 90 L.Ed.2d at 87-89. Jury selection was not reported. However, the State told the district court that it had exercised its peremptory challenge on this particular juror because when asked about police officers’ credibility, “he was very emphatic in shaking his head and told me that he didn’t believe their credibility.” The court overruled Thomas’s Batson challenge for the following reasons:
The Court acknowledges that [this potential alternate juror] did emphatically shake his head and said he had a problem with officer credibility. The Court wrote that down in its notes and circled that as an issue. The Court does think that’s a race-neutral reason for the strike, and the Court will allow the strike.
In any event, the alternate juror who was actually chosen was never seated as a regular juror in the case.
Giving deference to the trial court’s finding, we conclude there was no Batson error because the State had a race-neutral reason for striking this potential alternate juror. See State v. Griffin, 564 N.W.2d 370, 375-76 (Iowa 1997) (rejecting a Bat-son challenge and noting that a reviewing court ordinarily should give “great deference” to the trial court’s findings in this area). We do not reach the State’s alternative argument that if a Batson error occurred, it was harmless because the alternate juror was never seated as a regular juror and did not participate in deliberations.[2]
IY. Conclusion.
For the foregoing reasons, we affirm the district court’s judgment and sentence and vacate the decision of the court of appeals.
*448 DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AND SENTENCE AFFIRMED.
All justices concur except HECHT, WIGGINS, and APPEL, JJ., who dissent.

. As the prosecutor urged during closing argument, "Drug dealers do not leave drugs laying out....”

. We also do not reach any of Thomas’s claims of ineffective assistance of counsel. Thomas may bring those claims in a postcon-viction relief proceeding. See State v. Clay, 824 N.W.2d 488, 502 (Iowa 2012) (noting the defendant may bring ineffective-assistance-of-counsel claims in a postconviction relief action).