# In the Iowa Supreme Court

No. 23–1117

Submitted September 11, 2024—Filed November 8, 2024

**State of Iowa,**

Appellee,

vs.

**Reuben Daniel Schooley,**

Appellant.

Appeal from the Iowa District Court for Emmet County, Charles K. Borth, judge.

The defendant challenges his conviction and sentence for child endangerment causing bodily injury. **Affirmed.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General, and Joshua A. Duden (argued), Assistant Attorney General, for appellee.

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye (argued), Assistant Appellate Defender, for appellant.

**Oxley, Justice.**

This appeal requires us to consider whether a father's actions crossed the line from lawful corporal punishment to criminal conduct. Reuben Schooley was arrested after he slapped his then nine-year-old daughter across the head, spanked her, yanked her by the shirt, and told her to get out of the house because she was acting like an animal. A jury ultimately convicted him of child endangerment causing bodily injury. Schooley maintains there was insufficient evidence to support his conviction. The excessiveness of corporal punishment is generally a question for the jury. Upon our review of the evidence, we conclude that sufficient evidence supports the jury's verdict.

Schooley also challenges his five-year sentence of incarceration as improperly influenced by the victim-impact statement submitted by the guardian ad litem (GAL) on behalf of the child. Schooley argues that the GAL was not authorized to provide a victim-impact statement under Iowa Code sections 915.21 and 915.37 (2022). But Schooley failed to raise that issue in the district court when specifically asked by the court if he had any objections to the statement, thereby waiving the challenge. Schooley also argues that the district court relied on improper information contained in the GAL's victim-impact statement. We require an affirmative showing that the district court relied on improper evidence introduced through an unchallenged victim-impact statement before we will infer that the district court failed to properly exercise its discretion in filtering out any improper statements. No such affirmative showing is evident in the record. We therefore reject Schooley's sentencing challenges.

As explained more fully below, we affirm Schooley's conviction and sentence.

## I. Factual Background and Proceedings.

On June 12, 2022, Deputy Thomas Schultes was dispatched to Reuben Schooley's residence regarding a physical altercation between Schooley and his then nine-year-old daughter, A.S. A neighbor, who lived a block or two away from Schooley, was outside with family and friends when A.S. showed up, afraid and alone. The neighbor observed marks on A.S.'s collar area. A.S. told the neighbor that Schooley "had grabbed her by the collar of her shirt and slammed her head into the wall, called her a dirty animal, and kicked her out of the house." A.S. told the neighbor that Schooley engaged in this conduct because she took something that belonged to her siblings.

Ten to fifteen minutes later, Schooley showed up at the neighbor's house. When Schooley arrived, A.S. was scared and told the neighbor that she did not want to go with Schooley. Once Schooley and A.S. left the neighbor's house to return home, the neighbor immediately called the police and the Iowa Department of Human Services (DHS). After speaking with the neighbor, Deputy Schultes went to Schooley's house where he and A.S. lived with his girlfriend, Tessica McNeese, and her three children.

Deputy Schultes first spoke with Schooley on the front doorstep. Schooley told Deputy Schultes that he kicked A.S. out of the house because A.S. was not obeying rules and thus behaving like an animal, comparing A.S. to their dog. After Deputy Schultes asked Schooley if he could talk with A.S., Schooley went back inside the house to get A.S. Deputy Schultes and A.S. then spoke privately on the sidewalk, near his patrol car. A.S. told Deputy Schultes that Schooley yanked her by the shirt, hit her on the head, and spanked her. Deputy Schultes observed that A.S. was scared, uncomfortable, and had red marks near her collar

area. The deputy took photographs of the marks, which appeared fresh, possibly from recent fingernail scratches.

Deputy Schultes then spoke with Schooley again outside the house. Schooley admitted that he spanked A.S. and yanked her by the shirt but denied hitting A.S. on the head. Based on these interviews, Deputy Schultes arrested Schooley for child endangerment causing bodily injury. After being placed in the back of the patrol car, Schooley elaborated that after he spanked A.S., he sat her up and removed an extra shirt that she was wearing.

Once Schooley was secured in the back of the patrol car, Deputy Schultes spoke with McNeese inside the house. Deputy Schultes asked McNeese to check A.S.'s bottom for any injuries. When McNeese pulled down A.S.'s pants, McNeese and Deputy Schultes observed bruising on A.S.'s left buttock. McNeese spontaneously responded, "Uh-oh," when she saw the bruising. Deputy Schultes took photographs of the bruising, which contained different discoloration (mainly a brownish color with blue and purple remaining), indicating various stages of healing. Deputy Schultes then went back to his patrol car to inform Schooley of the bruising. Schooley admitted that he spanked A.S. on both sides of her buttocks that day, estimated that he spanked A.S. every other day, and agreed that leaving marks is abuse rather than discipline. Schooley also admitted to Deputy Schultes that he had hit A.S. on the head in the past when he was angry and that he felt guilty afterward. The State charged Schooley with child endangerment causing bodily injury, in violation of Iowa Code sections 726.6(1)(b) and 726.6(7).

The two-day trial began on May 9, 2023. Seven witnesses testified, including McNeese and Schooley, who were the only defense witnesses. The State's witnesses included A.S., the neighbor, Deputy Schultes, and two child

protective workers with DHS. The trial testimony revealed that A.S. had been grounded for the majority of the last two years. During that time, A.S. was deprived of basic bedroom furniture, forced to eat alone in her bare bedroom, and limited to two outfits, including a shirt that said, "Don't trust me."[1] Her bed was propped up against the wall, and she couldn't use it unless she asked first. A.S. was required to wear a bell around the house so that Schooley and McNeese could keep track of her whereabouts. McNeese agreed that this was "extremely degrading."

With respect to the specific day in question, McNeese testified that she had been yelling at A.S. for "getting into something," when Schooley came out of his room and "grabbed [A.S.], kind of put his arm around her head . . . and slapped her on the top of the head." McNeese had never seen Schooley act that "blunt or excessive" with A.S.

Schooley testified that after entering the situation due to McNeese's yelling, he took A.S. to her bedroom, spanked her with an open hand as she lay on the floor, yanked the "Don't trust me" shirt over her head because it was "not for public display," and told her to get out of the house because she was acting like an animal. Schooley admitted alternating which side of her buttocks he spanked because he did not like spanking the same side. And at trial, Schooley admitted: "The head thing is not a disciplinary thing. It wasn't appropriate for discipline."

McNeese testified that she was the primary disciplinarian and had tried different things with A.S. over the past two years, using both rewards and punishments. Not knowing what else to do, she had recently made a paddle and used it to spank A.S. within the week before the incident that brought Deputy

---

[1]McNeese testified that she made the shirt, but Schooley did not stop McNeese from making the shirt nor did he stop McNeese from forcing A.S. to wear the shirt inside the house as a punishment.

Schultes to the house. Although McNeese denied ever seeing Schooley use the paddle on A.S. and did not think Schooley caused the bruising on A.S.'s left buttock, McNeese also denied that she caused the bruising. Schooley testified that he knew of the paddle but denied ever using it. A.S. testified that "it was mostly just" McNeese who spanked her and that the bruising was from McNeese spanking her with the paddle a couple of days before this incident. But A.S. also testified that Schooley spanked her every other day and spanked her "maybe once" with the paddle.

The jury found Schooley guilty.

A presentence investigation report (PSI) was prepared in advance of Schooley's sentencing hearing. After considering the minutes of testimony, Schooley's criminal history, and the pending charge, the PSI author recommended a suspended sentence and probation. On the afternoon of July 13—one day before Schooley's scheduled sentencing—A.S.'s GAL from related chapter 232 proceedings filed a "report to the court," recommending incarceration. At sentencing, the State asked the district court to impose incarceration as recommended by the GAL. Schooley asked the district court to impose a suspended sentence and probation consistent with the PSI author's recommendation. The district court sentenced Schooley to a term of incarceration not to exceed five years.

This appeal followed, which we retained.

**II. Analysis.**

**A. Sufficiency of Evidence.** Schooley challenges the sufficiency of the evidence supporting his conviction for child endangerment causing bodily injury, a class "D" felony, in violation of Iowa Code sections 726.6(1)(*b*) and 726.6(7). "This court reviews sufficiency of evidence claims for the correction of errors at

law." *State v. Mathis*, 971 N.W.2d 514, 516 (Iowa 2022). We defer to the jury's verdict as long as it is supported by substantial evidence "sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* at 516–17. "[W]e view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.' " *Id.* at 517 (quoting *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005)).

Jury Instruction No. 14 provided that to convict Schooley of child endangerment causing bodily injury, the State had to prove beyond a reasonable doubt that:

> 1. On or about the 12th day of June, 2022, the defendant was the parent of [A.S.].
>
> 2. [A.S.] was under the age of fourteen years.
>
> 3. The defendant intentionally committed an act or series of acts which used unreasonable force, torture, or cruelty that resulted in bodily injury to [A.S.].[2]

*See* Iowa Code § 726.6(1)(*b*). Schooley stipulated that he is A.S.'s father and that she was under fourteen years old, so his conviction turns on the third element: the reasonableness or excessiveness of the punishment.

Under Iowa law, "parents have a right to inflict corporal punishment on their child, but that right is restricted by moderation and reasonableness." *State v. Arnold*, 543 N.W.2d 600, 603 (Iowa 1996). Corporal punishment must be corrective rather than abusive in character. *Id.* "This determination 'varies with the age, physical condition, and other characteristics of a child as well as with the gravity of the child's misconduct.' " *State v. Benson*, 919 N.W.2d 237, 242

---

[2]Jury Instruction No. 16 defined "bodily injury" as "physical pain, illness, or any impairment of physical condition."

(Iowa 2018) (quoting *Arnold*, 543 N.W.2d at 603). Accordingly, Jury Instruction No. 15 provided the following:

> A parent of a child under the age of 14 may use reasonable and timely physical punishment to discipline the child.
>
> In determining the reasonableness of the force used, you may consider the age, physical condition and other characteristics of the child; the gravity of the misconduct; the amount and means of the force used; and whether the punishment was corrective rather than to satisfy the anger of the person inflicting it.

Viewing the evidence "in the light most favorable to the State" and considering these factors, the record contains sufficient evidence to support the jury's verdict that Schooley is guilty beyond a reasonable doubt of child endangerment causing bodily injury. *Mathis*, 971 N.W.2d at 517–18 (explaining that unobjected-to jury instructions constitute "the law of the case for purposes of reviewing the sufficiency of the evidence"). First, there was substantial evidence that Schooley slapped A.S. on the head in what the jury could have found was an act of anger, not discipline. A.S. and McNeese both testified that Schooley slapped A.S. across the top of her head. McNease had never seen Schooley act so aggressively toward A.S. before. Schooley's admission of hitting A.S. on the head in the past when he was angry and acknowledgment that the "head thing" was not appropriate for discipline allowed the jury to infer that Schooley slapped A.S. out of anger—i.e., that his actions were "abusive rather than corrective in character." *Arnold*, 543 N.W.2d at 603.

Second, the jury could have found from the evidence that Schooley spanked A.S. hard enough "[o]n or about the 12th day of June" to leave bruising, even if the bruising did not result from the spanking on June 12. Schooley admitted spanking A.S. every other day, alternating which side of her buttocks he spanked because he did not like spanking the same side, allowing the jury to

reasonably infer he used sufficient force in his spankings to cause bruising. Moreover, Schooley admitted that he knew of the paddle, and A.S. testified that Schooley had spanked her with the paddle "maybe once." Given that McNeese testified that she made the paddle shortly before the June 12 incident, the jury could reasonably infer that Schooley used the paddle on A.S. near in time to June 12, even if McNeese also used it. The evidence that McNeese also spanked A.S. and used the paddle a few days prior to June 12 does not detract from the evidence that would allow the jury to reasonably infer that Schooley caused or contributed to the healing bruises of varying colors, which could also indicate to a reasonable jury that the bruises came from more than one incident.

Finally, both the neighbor and Deputy Schultes observed fresh scratch marks near A.S.'s collar area. A.S. told the neighbor that Schooley "had grabbed her by the collar of her shirt and slammed her head into the wall." Schooley admitted he yanked the shirt over A.S.'s head when he told her to get out of the house because the shirt was "not for public display," and he did not deny that he might have scratched A.S even though he was unaware of the marks until the deputy showed them to him.

Taken together, a reasonable jury could conclude from this testimony that Schooley "intentionally committed an act or series of acts which used unreasonable force, torture, or cruelty that resulted in bodily injury to [A.S.]." When there is evidence of a child being willfully disobedient—but also evidence of a parent's discipline being unduly severe and harsh—"the reasonableness or excessiveness of the punishment [is] a question for the jury." *Id.* at 604. A reasonable jury could conclude that Schooley caused the bruising on A.S.'s left buttock by spanking her every other day with sufficient force that he alternated sides and might have used a paddle on one occasion. *See Benson*, 919 N.W.2d

at 242–43 (holding there was substantial evidence to support assault causing bodily injury and child endangerment convictions when the child's bruises from a broomstick were still visible four days after the incident); *Arnold*, 543 N.W.2d at 603 (holding there was sufficient evidence to support a child endangerment conviction when the child's bruises from a belt were still visible three days after the incident). Schooley's admission that he alternated sides allowed the jury to infer that Schooley appreciated that his spankings were hard enough—and frequent enough—to leave bruising.

Further, a reasonable jury could conclude that Schooley's actions of slapping A.S. on the head and scratching her collarbone area when he yanked her extra shirt over her head were "abusive rather than corrective in character." *Arnold*, 543 N.W.2d at 603. "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014) (alteration in original) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)). Even though A.S. denied that Schooley slammed her head into the wall as she told the neighbor when asked by Deputy Schultes, she did testify that he slapped her across the head. It was for the jury to determine the severity of Schooley's actions. Schooley's action of slapping A.S. on the head, like the spanking, caused physical pain. Notably, Schooley was unable to explain what warranted slapping A.S. on the head, spanking her, yanking her by the shirt, or kicking her out of the house, relying instead on McNeese's vague assertion that A.S. was "getting into something." The cumulative effect of Schooley's actions supports the jury's verdict.

For these reasons, we conclude that the State presented sufficient evidence from which a jury could find that Schooley was guilty beyond a reasonable doubt of child endangerment causing bodily injury.

**B. GAL's Victim-Impact Statement.** Schooley next challenges his sentence, arguing that the district court improperly considered the GAL's victim-impact statement when sentencing him to incarceration instead of a suspended sentence because (1) the GAL was not authorized to provide a victim-impact statement under Iowa Code sections 915.21 and 915.37 and (2) the victim-impact statement contained allegations of unproven conduct.

We review sentencing decisions for the correction of errors at law. *State v. Fetner*, 959 N.W.2d 129, 133 (Iowa 2021). "A sentencing court's decision to impose a specific sentence that falls within the statutory limits 'is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters.' " *State v. Damme*, 944 N.W.2d 98, 105–06 (Iowa 2020) (quoting *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002)). "[O]ur task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *Formaro*, 638 N.W.2d at 725. That said, a sentencing court abuses its discretion when it relies on improper factors to reach a sentence. "We have previously explained that a sentencing court cannot consider unproven or unprosecuted offenses in fashioning a defendant's sentence unless the defendant admits them or facts are presented to prove them." *Fetner*, 959 N.W.2d at 135. We address Schooley's two challenges to the GAL's victim-impact statement in turn.

1. *Whether the GAL was authorized to provide a victim-impact statement.* Allowing a victim to be heard at a defendant's sentencing provides an important

avenue of closure for the victim while providing information to the sentencing court about the consequences of the defendant's criminal behavior. Iowa Code section 915.21, part of the Victim Rights Act, *see id.* § 915.1, provides several ways a victim can present her victim-impact statement to be used at sentencing. She can provide a written statement to the county attorney to be included with the PSI, give a statement orally in open court or via video or audio from a remote location, or record a statement by video or audio to be played at the sentencing hearing. *Id.* § 915.21(1)(*a*)–(*d*). But "[i]f the victim is *unable* to make an oral or written statement because of the victim's age, or mental, emotional, or physical incapacity, the victim's attorney or a *designated representative* shall have the opportunity to make a statement on behalf of the victim." *Id.* § 915.21(1)(*e*) (emphasis added).

Iowa Code section 915.37, in turn, defines the GAL's role in representing the interests of a child prosecuting witness "at all stages of the proceedings arising from" a violation of, *inter alia,* Iowa Code section 726.6, including at sentencing. *State v. Lopez,* 872 N.W.2d 159, 177 (Iowa 2015) (emphasis omitted) (quoting Iowa Code § 915.37(1)). The GAL shall "support the child and advocate for the protection of the child," but she may not "separately introduce evidence or . . . directly examine or cross-examine witnesses." Iowa Code § 915.37(1)(*a*). In addition, the GAL "shall file reports to the court as required by the court." *Id.* A GAL already representing a child's interests in a chapter 232 proceeding is given priority under section 915.37 to be appointed to represent the child in the criminal proceedings. *Id.*; *see also Lopez,* 872 N.W.2d at 177. On Schooley's own motion, the court appointed the same GAL involved in the chapter 232 child-in-need-of-assistance proceedings to serve as A.S.'s GAL for purposes of Schooley's criminal proceedings.

Schooley argues that the record does not establish that A.S. was "unable" to make her own victim-impact statement or that the GAL was A.S.'s "designated representative" within the meaning of section 915.21. *See, e.g., State v. Tesch*, 704 N.W.2d 440, 450–53 (Iowa 2005) (holding that a victim-impact statement by an injured motorist's wife should not have been allowed at sentencing because she was not a "victim" as defined in chapter 915 and the injured motorist was not a minor, incompetent, or deceased—i.e., "he was able to give a victim impact statement himself"). And even if the GAL was A.S.'s designated representative, Schooley argues the GAL's victim-impact statement included statements that exceeded the statutorily defined role of a GAL during sentencing.

We decline to consider whether the GAL was statutorily authorized to provide a victim-impact statement on A.S.'s behalf in this case because Schooley did not make that challenge in the district court. "Generally, error is preserved on an issue if (1) a party raises the issue before the district court, (2) the district court rules upon the issue, and (3) the party again raises the issue on appeal." *State v. Gross*, 935 N.W.2d 695, 698 (Iowa 2019). But if a party does not raise an issue before the district court, there is no ruling for our appellate courts to review.

The GAL's report to the court was filed by the probation office as a "supplemental addendum" to the PSI and described by the PSI author as a "Victim Impact Statement" received from the victim witness coordinator in Emmet County. We have said that "[i]n determining a defendant's sentence, a district court is free to consider portions of a [PSI] that are not challenged by the defendant." *State v. Grandberry*, 619 N.W.2d 399, 402 (Iowa 2000) (en banc) (collecting cases).

At the sentencing hearing, both the State and Schooley had an opportunity to raise objections and propose corrections to the PSI. When the district court asked Schooley's counsel if she and Schooley had an opportunity to review the PSI "and addendum," counsel responded affirmatively. Notably, Schooley's counsel proposed corrections to the PSI concerning Schooley's financial history, marital relationship, and living arrangements—but did not challenge the GAL's authority to provide the report filed as an addendum. Nor was this authority challenged later in the sentencing hearing when the GAL's statement was read verbatim.

Under the circumstances of this case, Schooley failed to preserve the issue of whether the GAL was authorized by Iowa Code section 915.21 to provide a victim-impact statement on A.S.'s behalf. *See Grandberry*, 619 N.W.2d at 402 (explaining that, at sentencing, a district court is free to consider portions of PSIs that are not contested by a defendant).

2. *Whether the district court improperly considered allegations of unproven conduct contained in the GAL's victim-impact statement.* A failure to object at sentencing does not foreclose a defendant from arguing that the district court abused its discretion by considering unproven conduct in reaching a sentence. We do not require a defendant to interrupt the sentencing judge as he gives the reasons for a sentence to suggest he is abusing his discretion. *See State v. Gordon*, 921 N.W.2d 19, 22 (Iowa 2018) ("[A] defendant need not first challenge a district court's abuse of discretion at the time of sentencing to have the matter directly reviewed on appeal." (collecting cases)). "If a court in determining a sentence uses any improper consideration, resentencing of the defendant is required. This is true even if it was merely a 'secondary consideration.'" *Grandberry*, 619 N.W.2d at 401 (citation omitted).

"[W]hen a challenge is made to a criminal sentence on the basis that the court improperly considered unproven criminal activity, the issue presented is simply one of the sufficiency of the record to establish the matters relied on." *Id.* (quoting *State v. Longo*, 608 N.W.2d 471, 474 (Iowa 2000) (en banc)). Thus, the sentencing court does not abuse its discretion by considering unproven, but unobjected to, conduct included in the PSI if the defendant admits the conduct or if other evidence before the sentencing court establishes the conduct. *See id.* at 402–03 (holding that a default judgment included in the PSI provided sufficient evidence of the defendant's failure to appear for a prior charge to allow the sentencing court to consider it in determining the defendant's need for deterrence); *see also State v. Gonzalez*, 582 N.W.2d 515, 517 (Iowa 1998) (per curiam) (holding that the sentencing court did not abuse its discretion in considering defendant's involvement in a sale of cocaine, although the related charges were dropped as part of the plea deal, where the defendant admitted the conduct in his interview with the PSI author and did not object to including the admission in the PSI).

The GAL's victim-impact statement included seventeen numbered paragraphs, including the following statements:

> 10. . . . . Soon after [Schooley] was convicted of abusing his daughter, concerns began to arise that he was starting his pattern of abuse again.
>
> . . . .
>
> 13. . . . . Guardians ad litem can help the court fashion a sentence that is both punitive for the offender and psychologically rewarding for the child.
>
> 14. Guardians ad litem may assist child victims in writing impact statements for submission to the court at sentencing, or they may submit their own written or oral statement on behalf of the child. This input is particularly helpful for child victims of intrafamilial abuse, whose unique situation should be considered.

Many of these children harbor ambivalent feelings towards the offenders, and for some a prison sentence would trigger severe guilt reactions. Through the guardian ad litem, the children's interests can be expressed, and perhaps viable sentencing alternatives can be suggested, much as the guardian ad litem recommends appropriate placements in juvenile court.

15. . . . . The pattern of abuse continued up again after the verdict and the undersigned feels that unless [Schooley] faces serious punishment for the abuse he caused his child and the abuse he allowed his girlfriend to cause, he will simply do it over and over again and get better at hiding it.

16. . . . . The family has shown through the course of the trial and subsequent that they will retaliate against A.S.

These statements included not only allegations of unproven conduct, but also arguably go beyond the scope of a victim-impact statement by suggesting that GALs have special expertise to assist the district court in sentencing defendants when child victims are involved.

Even if improper material is presented at sentencing, it is reversible error only if the district court relied on it. *See State v. Sailer*, 587 N.W.2d 756, 762 (Iowa 1998) ("We first must ascertain whether the district court did indeed rely on unprosecuted or unproven offenses in determining [the defendant]'s sentence."). Absent consideration of an improper factor, a district court's sentencing decisions are cloaked with a strong presumption in their favor. *Damme*, 944 N.W.2d at 105–06. This is a heavy burden. "[T]o overcome the presumption the district court properly exercised its discretion, there must be an affirmative showing the court relied on . . . improper evidence." *Sailer*, 587 N.W.2d at 762 (omission in original) (quoting *State v. Dake*, 545 N.W.2d 895, 897 (Iowa Ct. App. 1996) (per curiam)). "We will not draw an inference of improper sentencing considerations which are not apparent from the record." *Formaro*, 638 N.W.2d at 725.

We generally rely on district courts to know what they can and cannot consider from a victim-impact statement.

> [I]t is essential to the purpose of the victim impact statement that the victim be given an opportunity to fully convey the impact a crime has had. Although this may at times result in the airing of allegations which are unproven, we trust that our district courts, when weighing such statements as part of the sentencing determination, will filter out improper or irrelevant evidence.

*Sailer*, 587 N.W.2d at 764.

Here, the district court identified several factors to support Schooley's sentence, including maximum opportunity for rehabilitation, protection of the community and A.S., the nature of the offense as a crime of violence against a child, and the fact that this was not an isolated event but "a series of events over a period of time, in conjunction with emotional abuse." The district court then stated:

> The Court notes the contents of the presentence investigation. The Court finds, as suggested by the guardian ad litem, that probation would not be an adequate deterrent to this defendant. The defendant's own words seem to confirm that. Most of his allocution seemed to be concerned about the process by which [A.S.] was removed from his care.

We conclude that, considered in context, the district court's statement ("as suggested by the guardian ad litem") does not amount to the clear evidence in the record needed to overcome the strong presumption that the district court properly exercised its discretion in "filter[ing] out improper or irrelevant evidence." *Id.*; *see also State v. Canady*, 4 N.W.3d 661, 676 (Iowa 2024) ("[D]espite what appears to have been a verbal slip of the tongue, we trust that the district court, which did a thorough and careful job of presiding over this trial, filtered out anything in the minutes of testimony that wasn't actually proved at trial."); *State v. Guise*, 921 N.W.2d 26, 30 (Iowa 2018) (holding that the

district court's initial reference to "a $100 domestic abuse surcharge," which defense counsel pointed out did not apply to defendant's burglary conviction, was insufficient to affirmatively show that the sentencing judge considered uncharged conduct where the judge did not reference a domestic assault while subsequently discussing reasons for imposing sentence for a burglary conviction); *State v. Ashley*, 462 N.W.2d 279, 282 (Iowa 1990) ("The fact that the sentencing judge was merely aware of the uncharged offense is not sufficient to overcome the presumption that his discretion was properly exercised. . . . [T]here must be an affirmative showing that the trial judge relied on the [information]."). While the district court agreed with the GAL's recommendation, it expressly identified evidence from trial and Schooley's own allocution as the basis for its conclusion that probation would be an inadequate deterrent. Without an affirmative showing otherwise, we decline to infer that the district court relied on statements from the GAL's victim-impact statement that might have exceeded the scope of the GAL's role at sentencing or included allegations of unproven conduct. The district court did not abuse its discretion in sentencing Schooley to a period of incarceration.

### III. Conclusion.

For the reasons stated above, sufficient evidence supports the jury's verdict, and the district court did not abuse its discretion in imposing a five-year prison term. We therefore affirm Schooley's conviction and sentence.

**Affirmed.**