# IN THE COURT OF APPEALS OF IOWA

No. 23-1773
Filed April 9, 2025

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**LAKENDRICK ANTWON MOSLEY,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Webster County, Angela L. Doyle, Judge.

A defendant appeals his conviction for murder in the first degree. **AFFIRMED.**

Gregory F. Greiner, Assistant Public Defender, Des Moines, for appellant.

Brenna Bird, Attorney General, and Joshua Henry, Assistant Attorney General, for appellee.

Considered without oral argument by Schumacher, P.J., Langholz, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**BOWER, Senior Judge.**

Lakendrick Mosley appeals his conviction for murder in the first degree, challenging the sufficiency of the evidence supporting the jury's verdict. Upon our review, we affirm.

## I. *Background Facts and Proceedings*

At approximately 3:00 a.m. on Christmas morning 2022, Montreail Dungy was shot and killed while he sat in a parked car in the Pleasant Valley neighborhood of Fort Dodge. During the ensuing investigation, police learned about a "disagreement" between Dungy and Darwin Green. Green is Mosley's half-brother, and Dungy was their cousin. Dungy also shared a child with Shakiya Clayton, Green's girlfriend. Evidence placed Mosley, Green, Dungy, and others at a nearby bar approximately one hour before the shooting. Video footage and cell phone data supported testimony that Mosley retrieved a gun after the bar closed and placed Mosley in Dungy's presence at the time of the shooting. After the shooting, Mosley's stories about his whereabouts changed several times.

The State charged Mosley with first-degree murder, and a warrant was issued for his arrest. Mosley absconded to Minnesota, and he took flight on foot when an officer attempted to stop him for speeding. By the time Mosley was arrested in March 2023, he had altered his appearance by shaving his beard and cutting his hair. Mosley entered a plea of not guilty, and the case proceeded to trial. Mosley did not testify. The jury found Mosley guilty as charged. The district court entered judgment and sentence, and Mosley appeals.

## II. Standard of Review

We review challenges to the sufficiency of the evidence supporting a conviction for correction of errors at law. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We are bound by the jury's verdict if it is supported by substantial evidence. *Id.* Evidence is substantial if it is sufficient to convince a reasonable juror the defendant is guilty beyond a reasonable doubt. *Id.* To assess whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all "legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.*

## III. Sufficiency of the Evidence

To convict Mosley of first-degree murder, the jury was instructed the State had to prove:

> 1. On or about December 25, 2022, the defendant shot Montreail Dungy.
> 2. Montreail Dungy died as a result of being shot.
> 3. The defendant acted with malice aforethought.
> 4. The defendant acted willfully, deliberately, premeditatedly and with a specific intent to kill Montreail Dungy.

Mosley contests only the first element—that he was the person who shot Dungy.

Based on the evidence presented at trial, reasonable jurors could have found the following facts. On the afternoon of December 24, Mosley and his girlfriend, Emily, drove from their home in Des Moines to Fort Dodge to visit their families. They met up again at around midnight at the Brass Monkey bar. Mosley asked Emily to stay with him that night, but she said no because they "had been arguing." When Emily found out about Dungy's death later that morning—after

Mosley knew—she texted Mosley about it. He responded he "didn't know"; "are you serious?." Then he "went distant for a little bit."

In the meantime, witnesses and video footage placed Dungy, Mosley, and Green at the Brass Monkey until approximately 2:00 a.m. Green and Mosley left in Green's dark blue Toyota Avalon. Dungy left in a different car. Shortly after 2:30 a.m., Mosley called Jermiah Preston and asked Jermiah for a 9 millimeter gun.[1] At around 2:40 a.m., Mosley met Jermiah and his sisters outside Jermiah's mother's house, approximately "four, five blocks" from where the shooting took place. Jermiah gave Mosley the gun. Video footage from various vantages in the neighborhood depicted Green's car driving slowly around the Pleasant Valley neighborhood streets, and in particular, in an area cars were parked in front of a house party.

Calvina Naylor was parked outside the house party just before 3:00 a.m. while she waited for her sister to use the bathroom inside the house. Dungy's car was parked directly behind her. Calvina also "saw a black vehicle sitting on the corner." Calvina then saw someone standing next to Dungy's car, heard gunshots, and the person took off running.

Mosley's cousin, Mia, was also parked in front of the house party at the time of the shooting. Mia heard gunshots and saw "somebody running" with a "hood on," "a mask," and "a slender buil[d]." Before the shooting, she noticed "a black four-door looking car" "parked on the corner . . . , pulled up there, but that's the only vehicle that was out moving around like ours."

---

[1] Mosley "sporadically" asked Jermiah for guns "when he came back to Fort Dodge" from Des Moines.

Dungy died at the scene. His cause of death was "multiple gunshot wounds" from shots fired from a 9 millimeter gun. Mosley acknowledged he went to the house party area to "watch[] the police at the crime scene" and "[t]o see if his cousin was dead."

Police interviewed Mosley on December 28 and January 12. Mosley initially stated he didn't remember if Dungy was at the Brass Monkey, but he later acknowledged he hugged Dungy at the bar. Mosley stated his girlfriend was named Sarah Johnson, but then acknowledged his girlfriend was named Emily. Mosley told police he left the bar at closing time with "Walter," went to a convenience store, and then got dropped off at his aunt Shabreka's house, where he remained until his cousin Keyonna picked him up sometime after the shooting. When confronted with questions about where cell phone data would place his phone during that timeframe, Mosley's "first response was he wasn't sure he had his phone on him." He then "changed [his story again] to that he got in the car with his cousin around 2 or 3 . . . [then] maybe between 2:50 and 3 a.m., so his answer kind of changed once we started talking about phone records and where it might show him as far as being in [Pleasant] Valley." Shabreka's phone records placed Mosley's arrival at her house at 3:24 a.m. According to Shabreka, Mosley came in, used the bathroom, talked to her for about ten minutes, and then got picked up.

After a warrant was issued for his arrest, Mosley drove to Minnesota. On March 24, Minnesota State Trooper David Borden attempted a traffic stop of a speeding vehicle, driven by Mosley. Mosley led Trooper Borden on a vehicle chase through a neighborhood, and when he stopped, he then took flight on foot. Trooper Borden found Mosley hiding under a deck. Mosley initially refused to

provide his identification. When Trooper Borden told Mosley he stopped him for speeding, Mosley responded, "You got lucky. I'm on the run" and stated he was "charged with first-degree murder."

Mosley had "altered his appearance pretty dramatically" by shaving his full beard and cutting his hair. A haircutting kit was found in the car he was driving. He was wearing a white medical face mask. On a recorded phone call with Emily from jail, Mosley told her "he had to cut it all." He also told Emily he went to Minnesota to "[g]et away" because he was "going to go away forever."

On appeal, Mosley claims the evidence above is insufficient to establish he was the person who shot Dungy because there was "no eyewitness identification." However, despite a lack of "direct proof" of Mosley's involvement, the State "presented solid circumstantial evidence that [Mosley] was the shooter." *State v. Moore*, No. 22-1794, 2024 WL 3292539, at *3 (Iowa Ct. App. July 3, 2024).

Mosley next points to slight discrepancies in Calvina and Mia's testimony as to the clothing worn by the shooter and claims it is "unlikely" he would have "voluntarily returned to the scene where he just committed murder." However, inconsistencies in witness testimony "are for the jury's consideration, and do not justify a court's usurpation of the factfinding function of the jury." *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005) (citation omitted); *State v. Davis*, No. 23-1783, 2024 WL 4966034, at *2 (Iowa Ct. App. Dec. 4, 2024) ("Although there may be gaps in the evidence or evidence that contradicts the State's theory, questions about weight and credibility of the evidence are for the jury to decide.").

Mosley next emphasizes that because Jermiah appeared at trial "in shackles" and initially denied giving Mosley a gun, his "testimony did not raise a

fair inference of guilt." Indeed, Jermiah acknowledged he was in federal prison on a probation revocation and he was subpoenaed to testify. Jermiah stated the first time he spoke to investigators, he had "just been picked up" and he thought the officers were "bluffing" so he "just basically, you know, said a bunch of stuff and got up out of there." And he didn't want to get Mosley in trouble. But the second time he was interviewed, Jermiah thought the officers "knew more about the investigation" so he "came clean" because there was no point in lying. Again, the jury was able to hear Jermiah's testimony and reach a conclusion about the veracity and weight of his testimony. *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury is free to reject certain evidence, and credit other evidence." (cleaned up)). Although Mosley maintains Jermiah's testimony "at best merely created speculation, suspicion, and conjecture that [Mosley] eventually used his gun to kill Dungy," that conclusion was for the jury to make. *See id.*

Finally, Mosley points out the State's case is based mainly on circumstantial evidence, specifically pointing to the cell phone data and video images and the lack of a murder weapon. But direct and circumstantial evidence are equally probative. *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022). And the jury was instructed as such. When the evidence and inferences drawn from it are viewed in the light most favorable to the State, sufficient evidence supports the jury's verdict. Accordingly, we affirm Mosley's conviction for murder in the first degree.

**AFFIRMED.**